**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MEGAN DODGE, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>    v.<br><br>MEREO BIOPHARMA GROUP PLC, DENISE SCOTS-KNIGHT, and JOHN A. LEWICKI,<br><br>               Defendants. | Case No. 1:26-cv-988<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Megan Dodge ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to her own acts, and upon facts obtained through an investigation conducted by her counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Mereo BioPharma Group plc ("Mereo" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Mereo's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Mereo American Depositary Shares ("ADS") between June 5, 2023, and December 26, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.     Defendants provided investors with material information concerning their expected results for the Phase 3 ORBIT and COSMIC studies for setrusumab in Osteogenesis Imperfecta (OI). Defendants' statements included, among other things, confidence in setrusumab's ability to ultimately reduce the annualized fracture rates of the tested patients and in the study itself to put setrusumab in an opportunity to succeed in reaching statistical significance of this key endpoint.

3.     Defendants provided these positive statements to investors while, at the same time, disseminating false and materially misleading statements and/or concealing material adverse facts concerning the true state of the Phase 3 ORBIT and COSMIC programs; neither of which hit its primary endpoints of reducing annualized clinical fracture rate compared to the placebo or bisphosphonate control groups, respectively. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Mereo's ADS at artificially inflated prices.

4.     Investors began to question the veracity of Defendants' public statements on July 9, 2025, following Mereo's press release which informed investors that the Phase 3 Orbit study failed to achieve statistical significance for the second interim analysis. In pertinent part, Defendants announced the Phase 3 Orbit and Cosmic studies would now be "progressing toward final analysis."

5.     Investors and analysts reacted immediately to Mereo's revelation. The price of Mereo's ADS declined dramatically. From a closing market price of $2.94 per share on July 9,

2025, Mereo's ADS price fell to $1.69 per share on July 10, 2025, a decline of about 42.52% in the span of just a single day.

6.    Notwithstanding the July 9 disclosures, Mereo and the Individual Defendants continued to mislead investors. Defendants continued to create the false impression that they possessed reliable information pertaining to the success of the Phase 3 Orbit and Cosmic Studies. Defendants repeatedly insisted they were confident that setrusumab's ability to increase material bone density would necessarily translate to a reduction in the annualized fracture rate of the type 1, 3, or 4 OI patients.

7.    The full truth finally emerged on December 29, 2025, when Mereo issued a press release announcing that neither the ORBIT nor the COSMIC Phase 3 studies achieved statistical significance. The press release indicated that neither study met its primary endpoint of reduction in annualized clinical fracture rate ("AFR") compared to placebo or bisphosphonates, respectively, despite improved bone mineral density ("BMD").

8.    Investors and analysts reacted immediately to Mereo's revelation. The price of Mereo's ADS declined dramatically. From a closing market price of $2.31 per share on December 26, 2025, Mereo's ADS price fell to $0.29 per share on December 29, 2025, a decline of more than 87.7%.

## JURISDICTION AND VENUE

9.    Plaintiff brings this action, on behalf of herself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

10.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendant Mereo's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

14.     Plaintiff purchased Mereo ADS at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing her transaction(s) in Mereo is attached hereto.

15.     Mereo BioPharma Group plc is an international corporation with its principal executive offices located at One Cavendish Place, 4th Floor, London, W1G 0QF, United Kingdom. During the Class Period, the Company's ADS traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "MREO."

16.     Defendant Denise Scots-Knight ("Scots-Knight") was, at all relevant times, the co-founder, board member, and Chief Executive Officer of Mereo.

17.     Defendant John A. Lewicki ("Lewicki") was, at all relevant times, the Chief Scientific Officer of Mereo.

18.    Defendants Scots-Knight and Lewicki are sometimes referred to herein as the "Individual Defendants." Mereo together with the Individual Defendants are referred to herein as the "Defendants."

19.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Mereo's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

20.    Mereo is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

21.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Mereo under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

22.    Mereo is a biopharmaceutical company focused on the development of therapeutics for rare diseases. Mereo's strategy is to acquire and develop product candidates for rare diseases that have already received significant investment for large pharmaceutical and biotechnology companies and that have substantial pre-clinical, clinical, and manufacturing data packages.

23.    In July 2015, Mereo pertinently acquired the rights to setrusumab from Novartis. Setrusumab is a rare disease product candidate for the treatment of osteogenesis imperfecta ("OI")

24.    On December 17, 2020, Mereo entered into a license and collaboration agreement with Ultragenyx Pharmaceutical Inc. ("Ultragenyx"), granting them the exclusive license to develop and commercialize setrusumab, excluding Europe, where Mereo retained commercial rights.

### *The Defendants Materially Misled Investors Concerning the*
### *Viability of Mereo's Phase 3 ORBIT and COSMIC Programs*

#### *June 5, 2023*

25.    On June 5, 2023, Mereo published a press release announcing positive data from the ongoing Phase 2/3 ORBIT study. In pertinent part, the press release stated:

> [D]ata from the dose-selection Phase 2 portion of the Phase 2/3 Orbit study showing that setrusumab rapidly induced bone production in OI-affected patients. Across all patients evaluated, as of the data cut off, setrusumab demonstrated statistically significant increases in levels of serum P1NP, a sensitive marker of bone formation, and a substantial and significant improvement in bone mineral density (BMD) by 3 months.

26.    Also as part of the press release, published a statement by Gary Gottesman, MD, Professor of Pediatrics at Washington University School of Medicine, who reviewed the data, in relevant part:

> The rate of increasing bone mineralization we're observing on DXA scans is striking, unlike anything I have typically seen with bisphosphonate therapy. This increase in bone mass underscores the potential to make denser and stronger bone.

27.     Mereo also included a statement from the Chief Medical Officer, Eric Crombez, of its partner Ultragenyx, in pertinent part:

> The dramatic lumbar spine BMD improvements in children at 3 months show that growing bones are more dynamic, ***and we anticipate the potential for a greater effect on bone formation and strength in younger patients with maturing bones***. Based on the reports from study investigators, we're encouraged by the impact setrusumab appears to be having on bone health so far.

[Emphasis added].

<u>*July 6, 2023*</u>

28.     On July 6, 2023, Mereo issued a press release announcing that "Ultragenyx … today announced that the first patients have been dosed in both of its late-stage clinical trials evaluating setrusumab in pediatric and young adult patients with OI sub-types I, III and IV."

29.     Detailing the intent of the two studies, the release pertinently stated the following:

> The Phase 3 portion of the pivotal Phase 2/3 Orbit study is evaluating the effect of setrusumab compared to placebo on annualized clinical fracture rate in patients aged 5 to <26 years. The newly initiated Phase 3 Cosmic study is an active-controlled study evaluating setrusumab compared to intravenous bisphosphonate (IV-BP) therapy on annualized total fracture rate in patients aged 2 to <5 years.

30.     Ultragenyx's Chief Medical Officer Eric Crombez was quoted in the release, highlighting the joint venture's confidence in the study and the Phase 3 program, stating, in pertinent part:

> Data from the Phase 2 portion of the Orbit study demonstrated increases in bone formation and bone mineral density, which are important markers of bone strength, as well as early indications of improved bone health from our investigators . . . Our comprehensive Phase 3 program is designed to study the impact of setrusumab on clinical fracture risk reduction. The two Phase 3 trials will evaluate patients over a broad age range, including the ***younger pediatric population, where the risk of fracture is higher and where we can potentially have the greatest impact on their future health***."

[Emphasis added].

<u>*January 8, 2024*</u>

31.    On January 8, 2024, Mereo published a press release providing updates on Setrusumab. Defendant Scots-Knight stated, in relevant part:

> 2023 was a year of tremendous progress for Mereo. ***Key milestones in the development of setrusumab for the treatment of OI included positive data from the Phase 2 portion of the Orbit study, and initiation of the Phase 3 portion of the Orbit study and Phase 3 Cosmic study by our partner, Ultragenyx.*** In addition, we significantly advanced the development of alvelestat, gaining valuable clarity on the regulatory path with both the FDA and EMA. If the proposed Phase 3 study is successful, it could support submissions for full regulatory approvals for this first-in-class therapy addressing a major unmet medical need in Alpha-1 Antitrypsin Deficiency-associated Lung Disease. These developments are expected to further support our ongoing partnering activities for alvelestat. We look forward to providing further updates on both setrusumab and alvelestat during the remainder of the year. With a cash runway into 2026 and several potential important value inflection points on the horizon in 2024, we believe that Mereo remains well positioned for long-term growth and success.

[Emphasis added].

<u>*April 30, 2024*</u>

32.    On April 30, 2024, Mereo issued a press release announcing that "all patients have been enrolled across the Phase 3 Orbit and Cosmic Studies evaluating setrusumab (UX143) in pediatric and young adult patients with osteogenesis imperfecta (OI). The pivotal Phase 3 portion of the Orbit study has randomized 158 patients ages 5 to 25 years, and the Cosmic study has completed enrollment of 66 patients ages 2 to <7 years"

33.    The press release directly quoted Eric Crombez, Ultragenyx's Chief Medical Officer, who touted the Phase 2 ORBIT study results and expressed confidence in achieving the Phase 3 endpoints of decreased annualized fracture rate, in pertinent part:

> The interim ***Phase 2 Orbit study results show a rapid and clinically meaningful decrease in fracture rate, giving us confidence in our ability to bring this potential new treatment to patients living with OI***. Our goal is to provide patients and their

families a novel treatment that can significantly reduce the burden of fractures and improve their quality of life by building new and stronger bone.

[Emphasis added].

34. The release further quoted Nick Bishop, a Professor of Pediatric Bone Disease at the University of Sheffield Medical school, who similarly provided confidence in the Phase 3 tests opportunity in pertinent part as follows:

The interim Phase 2 results are very encouraging, and the speed with which we have been able to complete recruitment into both the Orbit and Cosmic studies clearly *reflects the positive views of the study clinicians as a whole regarding this investigational therapy.*

[Emphasis added].

35. Mereo then directly highlighted the results of the Phase 2 Orbit study, praising its fracture rate outcome while falling short of highlighting the limitations of the study and its translation to potential Phase 3 results:

Data presented at the American Society for Bone and Mineral Research 2023 Annual Meeting (ASBMR) from the Phase 2 portion of the Orbit study showed that treatment with setrusumab reduced the median annualized fracture rate by 67% and this reduction was associated with continuing large and meaningful improvements in bone mineral density (BMD). Setrusumab was generally well tolerated with no drug-related serious adverse events (SAEs) reported and no reports of drug-related hypersensitivity. Additional longer-term Phase 2 safety and efficacy data from the Orbit study are expected in the second half of 2024.

*June 11, 2024*

36. On June 11, 2024, Mereo published a press release announcing positive 14-month results from the Phase 2 portion of the Phase 2/3 ORBIT study. The press release stated, in pertinent part:

[A]s of a May 24, 2024 data cut-off date, treatment with setrusumab (UX143) continued to significantly reduce incidence of fractures in patients with OI with at least 14 months of follow-up. Treatment with setrusumab also resulted in ongoing and meaningful improvements in lumbar spine bone mineral density (BMD) at month 12 without evidence of plateau.

9

The large reduction in annualized radiologically confirmed fracture rate previously reported in patients treated for a minimum of 6 months was sustained in patients treated for at least 14 months with a high degree of significance. The median annualized rate of radiologically confirmed fractures across all 24 patients in the 2 years prior to treatment was 0.72. Following a mean treatment duration period of 16 months, the median annualized fracture rate was reduced 67% to 0.00 (p=0.0014; n=24). The annualized fracture rate excluded morphometric vertebral fractures and fractures of the fingers, toes, skull, and face, consistent with the Phase 3 study primary efficacy endpoint.

*       *       *

***The reduction in annualized fracture rates was associated with continued, clinically meaningful increases in BMD.*** Tests conducted at the 12-month timepoint demonstrated that treatment with setrusumab resulted in a mean increase in lumbar spine BMD from baseline of 22% (p<0.0001, n=19) across all age groups (5 to < 26 years old), a further improvement from 14% observed at 6 months of treatment. This increase in BMD is reflected in the change from the mean baseline lumbar spine BMD Z-score of -1.73 to -0.49 at 12 months across all age groups, a substantial normalization in Z-score of +1.25 (p<0.0001, n=18). This is further improved from the mean 6-month Z-score change of +0.85. The improvements in BMD and Z-scores were significant and consistent across all OI sub-types studied.

[Emphasis added].

37.     Also as part of the press release, Mereo published a statement by Dr. Gary Gottesman, in relevant part:

All indications are that setrusumab is having the effect we hoped for, ***safely reducing the incidence of fractures and improving BMD in patients with OI***. The anti-sclerostin antibody appears effective even after a year and remarkably, patients continue to make measurable gains, suggesting we will see an ongoing response over the long term.

[Emphasis added].

38.     Mereo also included a statement from the Ultragenyx's Chief Medical Officer, Eric Crombez, in pertinent part:

***The clinically meaningful continued improvement in BMD suggests that new and stronger bone is being created that has resulted in an important reduction in fractures across age groups and types of OI.*** With our phase 3 Orbit and Cosmic studies fully

enrolled we now look forward to the possibility to bring this potential new treatment to a larger number of patients living with OI.

[Emphasis added].

<u>August 13, 2024</u>

39.    On August 13, 2024, Mereo published a press release reporting second quarter 2024 financial results and provided an update on Setrusumab. Defendant Scots-Knight stated, in relevant part:

> ***We continued to make significant progress this quarter highlighted by additional positive data from the Phase 2 portion of the ongoing Phase 2/3 Orbit study in patients with OI. These data showed that the statistically significant annualized fracture rate reduction of 67% was maintained following treatment with setrusumab for at least 14 months of follow-up, further demonstrating the potential of setrusumab to generate long-term, clinically meaningful benefit for people living with OI.*** On alvelestat, we continue to work through the detailed regulatory submissions to ensure the AATD program is Phase 3-ready by the end of the year, in parallel with our ongoing discussions with multiple potential partners. With the proceeds from our June financing, we are well positioned through our key value inflection milestones and to support the ongoing pre-commercial activities essential for a successful launch of setrusumab in Europe following its potential approval.

*    *    *

> ***The reduction in annualized fracture rates was associated with continued, clinically meaningful increases in BMD.*** At the 12-month time point, treatment with setrusumab resulted in a mean increase in lumbar spine BMD from baseline of 22% (p<0.0001, n=19) and an improvement of the lumbar spine BMD Z-score from a mean baseline of -1.73 to -0.49 at 12 months. The improvements in BMD and Z-scores were significant and consistent across all OI sub-types studied.

[Emphasis added].

<u>November 12, 2024</u>

40.    On November 12, 2024, Mereo published a press release reporting third quarter 2024 financial results and provided an update on Setrusumab. Defendant Scots-Knight stated, in relevant part:

The Phase 3 program for setrusumab, led by our partners at Ultragenyx, continues to progress according to plan and we look forward to reporting the topline data during 2025. The recent receipt of Breakthrough Therapy designation from the U.S. FDA follows on from the PRIME designation we obtained in Europe. This reinforces the high unmet medical need for treatments for individuals affected by osteogenesis imperfecta (OI) who currently have no approved therapies, and the potential of setrusumab.  Our pre-commercial efforts in our key European markets are progressing well, including the discussions with the HTAs and payors through EUNetHA and scientific advice in the individual countries.  We continue to engage in discussions with multiple potential partners regarding the development and commercialization of alvelestat for AATD lung disease.  We remain on track for alvelestat to be Phase 3-ready around the end of the year, further solidifying our commitment to bringing innovative treatments to individuals with rare diseases.

*January 16, 2025*

41.    On January 16, 2025, Mereo participated in the JP Morgan Healthcare Conference,

wherein Defendant Scots-Knight provided an update on setrusumab. In pertinent part:

> ***It's really striking data. And importantly, the Z-score, which compares your BMD to an age and gender matched individual, we're starting to normalize disease scores in these OI patients. And that was irrespective of whether you're a type 1, type 3 or type 4. And we're often asked how does BMD translate into fracture reduction. So here we are in this phase, same Phase II study. We saw a medium 67% reduction in annualized fracture rate in this group of patients. Post treatment compared to pretreatment. But what we're also -- and that's -- I should mention that's the Phase III endpoint for the Orbit pivotal study.*** What we're most excited about apart from the reduction in fractures is the sort of photograph on the right, where you can see this little boy, he was 6 years old when he started treatment. He's in a wheelchair. He progressed during treatment from the wheelchair to the walker and then actually scaring the life out of his parents by playing football in the playground unaided.
>
> And so that's why we believe setrusumab has the potential to be a really transformative treatment, especially we can treat these very, very young children and treat them early. So the Phase -- the 2 Phase II studies, they were fully enrolled last year. And there are 2 studies, the Orbit, which is for the 5- to 25-year-olds. That is comparing setrusumab to placebo. And then Cosmic, which is the 2- to 6-year olds, which is comparing setrusumab to bisphosphonates. Both have a primary endpoints of annualized fracture rate with slightly different fractures included or excluded. So we've been through, there was an interim analysis, which used only 2% of the alpha.

[Emphasis added].

42.    During the question-and-answer portion of the call, Defendant Lewicki, responded

to analyst questions, in relevant part:

<Q: Unknown Analyst> Thank you, Denise. Now we'll open it up for questions. If nothing from the audience as of now, I'll just get things started. Can you maybe help us understand what would be the implications of not meeting the interim readouts for OI?

<A: John A. Lewicki> Yes. So basically, there are no implications to not hitting the first interim analysis. That was an extremely high bar. It use 2% of the alpha spend, so required a p-value of less than 0.001. And as Denise mentioned, the Phase IIIs were fully enrolled last April. And we took a look when all patients had been on roughly 6 to 8 months. But -- and some patients a little bit longer than that. But what's important to understand here is that for setrusumab to build sufficient bone to prevent fractures that takes a couple of months.

We start counting fractures when we first doze setrusumab. So there was a limited time for the curse to separate, like I said, the bar with a p of less than 0.001 was extremely high. And we had been saying since the beginning that it was unlikely that we would hit IA-1. It was a prudent thing to do because these patients don't have any approved therapies.

And if you can get them off placebo earlier, you would want to know. So it was good to take a look, but we knew with it that it was very unlikely. We're much more enthusiastic as Denise highlighted about IA-2 that's going to take place roughly midyear instead of 2% of the alpha spend, we're using 20%. So it requires a p value of less than 0.01. And it gives additional months, a significant number of additional months or more events to occur. So statistically, that has what we believe is a really good chance of hitting.

*I mean Denise showed the data from the Phase IIs. The reality is once patients are treated with setrusumab fractures become very infrequent. So we think IA-2 is set up to be successful. Should we have to go to a final analysis that would take place late in '25. We still retain 78% of the alpha spend, so a p of less than 0.039. Obviously, at that point, you'd have more events accumulating, but we're pretty confident that we have a great shot with that IA-2.*

[Emphasis added].

<u>*March 26, 2025*</u>

43.    On March 26, 2025, Mereo published a press release reporting full year 2024 financial results and providing updates on setrusumab. Defendant Scots-Knight stated, in relevant part:

> 2024 was a year of focused execution and strategic advancement at Mereo, driving our lead programs closer to key milestones. ***The Phase 3 Orbit study of setrusumab in osteogenesis imperfecta (OI) is set to read out at the upcoming second interim analysis mid-year or at the final analysis during the fourth quarter of 2025. This could set the stage for us, alongside our partner Ultragenyx, to file for regulatory approvals in the U.S. and EU.*** Our European pre-commercial activities are ongoing, where we are focused on laying the foundation for a successful and efficient commercial launch, following potential regulatory approval. On alvelestat, the recent receipt of European Orphan Designation and the Phase 3 readiness activities have been highly supportive for our ongoing partnering process. With a strong financial position, we look forward to a transformative 2025, focused on bringing life-changing therapies to patients with rare diseases.

[Emphasis added].

44.    As part of the same press release, the following pertinent updates were provided relating to Setrusumab:

> Setrusumab (UX143)
>
> Continued progress in two global studies, the Phase 3 portion of Orbit (Phase 2/3) and Cosmic (Phase 3), of setrusumab in OI patients, led by our partner Ultragenyx.
>
> a.    The Phase 3 portion of the Orbit Study is continuing to dose pediatric and young adult patients, with the second interim analysis expected mid-2025 and potential final analysis in the fourth quarter of 2025.
> b.    Treatment is ongoing in the open-label Phase 3 Cosmic study evaluating setrusumab against intravenous bisphosphonate therapy in patients aged 2 to <7 years. Data from this study will be evaluated in parallel with the interim or final analysis from the Orbit study.
>
> Pre-commercial activities to lay the foundation for launch ongoing.
>
> a.    Scientific advice obtained from GBA in Germany and NICE in the U.K.
> b.    Progress on project SATURN with existing registries that are appropriate sources of data on the natural history of OI and longitudinal data with the standard-of-care.

*May 13, 2025*

45.    On May 13, 2025, Mereo published a press release reporting first quarter 2025 results and providing an update on setrusumab. Defendant Scots-Knight stated, in pertinent part:

> As we close out the first quarter of 2025, we continue to anticipate that this will be an important, milestone-rich year for Mereo. ***The Phase 3 Orbit study of setrusumab in osteogenesis imperfecta remains on track to read-out either at the second interim analysis in mid-2025 or at the final analysis in the fourth quarter.*** We are continuing to invest in the pre-commercial activities for setrusumab to enable a successful launch in our European territory, following potential regulatory approvals. Further, alvelestat is now Phase 3 ready and we are finalizing the trial start-up activities to support our ongoing partnering process. Along with our late-stage pipeline, we believe that continued close management of our cash balance will enable us to support our operations into 2027.

[Emphasis added].

46.    As part of the same press release, the following pertinent updates were provided relating to setrusumab:

> Setrusumab (UX143)
>
> Continued progress in the two global Phase 3 studies led by our partner Ultragenyx:
>
> a.  The randomized, placebo-controlled Phase 3 portion of the Orbit study (in patients aged 5 to 25 years) is progressing toward the second interim analysis (IA2) in mid-2025 or a final analysis in the fourth quarter of 2025.  All patients have now been on therapy for at least 12 months, conduct of the study is going well and patient safety in the Phase 3 portion of the study is consistent with safety observed in the Phase 2.
> b.  Patients in the Cosmic study (aged 2 to <7 years) are being treated with either setrusumab or intravenous bisphosphonates (IV-BP) therapy and will be evaluated in parallel with the Orbit interim analysis. If Orbit progresses to full study completion in the fourth quarter of 2025, Cosmic will also continue to a data readout, to align with the Orbit readout without spending alpha at the mid-year interim assessment.
>
> Continued pre-commercial activities in Europe to support potential launch, including engagement with regulatory/HTA bodies and real-world data collection efforts through the SATURN program.

47.    The above statements in Paragraphs 25 to 46 were false and/or materially misleading by concealing and misrepresenting setrusumab's ability to achieve statistical significance for the primary endpoints in both the ORBIT and COSMIC studies. In truth, Mereo consistently oversold setrusumab's efficacy by relying on earlier clinical data that did not support the statements being made and/or the advancement to subsequent clinical trials. Thus, Mereo acted recklessly when claiming that the drug would reduce clinical fractures based on its clinically shown ability to increase bone mineral density. In fact, Mereo knew or recklessly disregarded that neither ORBIT nor COSMIC would reach statistical significance against the primary endpoints of reduction in annualized clinical fracture rate compared to placebo or bisphosphonates, respectively, because the Company relied on data that failed to control for either the benefits of increased standard of care or the impact of the placebo effect.

### *Mereo Reveals the Phase 3 ORBIT Study Did Not Achieve Primary Endpoints Sufficient to Produce the Second Interim Analysis Results*

#### *July 9, 2025*

48.    On July 9, 2025, Mereo and Ultragenyx jointly announced that the "Phase 3 portion of the Orbit study evaluating UX143 (setrusumab) in pediatric and young patients with osteogenesis imperfecta (OI) is progressing toward final analysis consistent with the original plan, around the end of the year."

49.    The Chief Executive Officer of Ultragenyx, Emil D. Kakkis, was quoted in the release, in pertinent part, as follows:

> Based on the feedback we hear from investigators and families who participated in the studies, we are confident that increasing bone mass leads to stronger bone, less fractures, and improved physical abilities . . . While we had hoped to be able to stop the study early, we look forward to having results from both Orbit and Cosmic around the end of this year."

50.     Notably, the release further reminded investors of the thresholds for the final analyses, in pertinent part:

> Consistent with the statistical analysis plan, data from the Cosmic study were not analyzed at this interim timepoint. Study conduct is going well and safety in this younger patient population is consistent with the safety profile in the other studies.

> Patients will continue dosing in the ongoing Phase 3 Orbit and Cosmic clinical studies with the final analyses to be conducted after patients have been on therapy for at least 18-months. The threshold for the Phase 3 Orbit final analysis is $p<0.04$ and for the Phase 3 Cosmic final analysis is $p<0.05$.

51.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the above-referenced investor communications. In those statements and publications, Defendants continually expressed confidence in the ability of its Phase 3 Orbit study to achieve the second interim results threshold necessary to present results to the investing public, while also minimizing the risk that the study could fail to demonstrate that setrusumab results in a reduction in AFR for the OI patients tested.

52.     Investors and analysts reacted immediately to Mereo's revelation. The price of Mereo's ADS declined dramatically. From a closing market price of $2.94 per share on July 9, 2025, Mereo's ADS price fell to $1.69 per share on July 10, 2025, a decline of about 42.52% in the span of just a single day.

53.     A number of well-known analysts who had been following Mereo lowered their price targets in response to Mereo's disclosures. For example, Needham, while lowering its price target more than 28%, summarized that "the Phase III Orbit study will continue towards a final analysis expected in 4Q:25 after missing on its second interim. This outcome represents our downside scenario[ ], as such, we expect MREO to be under pressure today." The analyst further explained that Needham was "lowering our Target to $5 due to increased uncertainty and adjusted potential launch timing."

54. The fact that this analysts, and others, discussed the failure of Mereo's drug, setrusumab, to achieve its secondary interim readout threshold suggests the public placed significant weight on Mereo's previous statements of confidence in setrusumab's potential to significantly reduce the AFR of the tested OI patients. The frequent, in-depth discussion of the interim miss confirms that Defendants' statements during the Class Period were material.

55. Notwithstanding Defendants' disclosures, they continued to mislead investors by misrepresenting their understanding of the risk that the Phase 3 Orbit and Cosmic studies would be unable to achieve their respective endpoints of reduced AFR. In doing so, the Defendants deceptively claimed confidence in the studies achieving positive results.

<u>*August 12, 2025*</u>

56. On August 12, 2025, Mereo published a press release reporting second quarter 2025 financial results and providing an update on setrusumab. Defendant Scots-Knight stated, in relevant part:

> ***We look forward to the final analysis for the two ongoing Phase 3 studies for setrusumab in osteogenesis imperfecta, the Phase 3 Orbit study in pediatric and young adult patients, and the Phase 3 Cosmic study in young pediatric patients, around the end of the year. We continue to be excited about the potential of setrusumab to reduce fractures and improve other functional parameters for individuals living with osteogenesis imperfecta.*** In parallel with the advancement of setrusumab, we are continuing to advance partnering discussions around alvelestat, our first-in-class oral small molecule for AATD-lung disease, and to ready the program for Phase 3 initiation. Our prudent management of our cash and resources means we are well positioned through these key milestones to support our operations into 2027.

[Emphasis added].

57. Also as part of the press release, Mereo provided an update pertaining to ORBIT and COSMIC, in pertinent part:

> The Phase 3 Orbit and Cosmic studies, led by our partner Ultragenyx, evaluating setrusumab in pediatric and young adult patients and young pediatric patients with

OI, are progressing towards their final analyses around the end of 2025. The randomized, placebo-controlled Phase 3 portion of the Orbit study was evaluated by the Data Monitoring Committee at an interim analysis in July 2025 and they informed Ultragenyx that setrusumab demonstrated an acceptable safety profile and that the study should continue to the final analysis. Data from the Cosmic study were not analyzed at the interim timepoint, consistent with the statistical analysis plan.

Patients will continue dosing in both the Phase 3 Orbit and Cosmic studies, with the final analyses to be conducted after patients have been on therapy for at least 18-months. The threshold for the Phase 3 Orbit final analysis is p<0.04 and for the Phase 3 Cosmic final analysis is p<0.05.

*<u>November 10, 2025</u>*

58.     On November 10, 2025, Mereo published a press release reporting third quarter 2025 financial results and providing an update on setrusumab. Defendant Scots-Knight stated, in pertinent part:

> ***We are rapidly approaching a major transition period in our corporate evolution, with the Phase 3 Orbit and Cosmic studies of setrusumab in osteogenesis imperfecta on track to read out around the end of the year. Based on the data from prior studies, we remain confident in the potential of setrusumab to reduce fractures and improve quality of life for people with OI.*** We continue to invest in commercial readiness activities to ensure Mereo is well positioned for a potential launch in our European territories. Alongside the progress of the setrusumab program, we are continuing to advance partnering discussions for alvelestat. In addition, we are excited to have retained European commercial rights in our recent partnership deal with āshibio for vantictumab, which is being investigated in autosomal dominant osteopetrosis type 2, another rare bone disease for which promising preclinical data were presented at this year's ASBMR Annual Meeting. With $48.7 million of cash at the end of the third quarter, we remain well-capitalized to continue executing through these important milestones.

[Emphasis added].

59.     Also as part of the press release, Mereo provided an update on the Phase 3 ORBIT and COSMIC studies, in relevant part:

> The Phase 3 Orbit and Cosmic studies, led by our partner Ultragenyx, evaluating setrusumab in pediatric and young adult patients and young pediatric patients with

OI, are progressing towards final analyses at which time patients will have been on therapy for at least 18 months.

The data from both Orbit and Cosmic are expected around the end of 2025. The threshold for the Phase 3 Orbit final analysis is p<0.039 and the threshold for the Phase 3 Cosmic final analysis is p<0.05.

60.     The above statements in Paragraphs 56 to 59 were false and/or materially misleading by continuing to conceal and misrepresent setrusumab's ability to achieve statistical significance for the primary endpoints in both the ORBIT and COSMIC studies. In truth, despite the failure of the study to achieve its second interim analysis, Mereo continued to oversell setrusumab's efficacy by claiming confidence in setrusumab's potential to reduce annualized fracture rates.  Defendants did so despite their awareness that the Phase II results were not a direct comparison to the potential of a successful Phase 3 outcome, absent a proper control group comparison during the Phase II study.  Notably, Mereo knew or recklessly disregarded that its claim that increased bone mineral density would lead to a decrease in fractures was based solely on the improved bone mineral density results shown at prior data readings, rather than a comparative decline in fracture rates.

### *The Full Truth Emerges*

*December 29, 2025*

61.     On December 29, 2025, Mereo published a press release announcing Phase 3 ORBIT and COSMIC results for setrusumab in Osteogenesis imperfecta (OI). In particular, *neither study achieved statistical significance against the primary endpoints* of reduction in annualized clinical fracture rate compared to placebo or bisphosphonates, respectively. Defendant Scots-Knight stated, in pertinent part:

Whilst we are disappointed by these results, we will be conducting additional analyses on the data, to assess next steps and the best path forward for the program, especially in pediatrics given the totality of the data and lack of other treatment

options for individuals with OI. In the meantime, we are carefully managing our cash resources with immediate reductions in our pre-commercial and manufacturing activities, and we are continuing to advance partnering discussions for alvelestat.

62.     Additionally, the press release provided further detail pertaining to the studies, in relevant part:

ORBIT and COSMIC bone mineral density (BMD) improvements

In the ORBIT study, participants experienced statistically significant and substantial improvements in BMD compared to placebo, at levels consistent with the treatment effect observed in Phase 2 studies. These BMD changes were not accompanied by a corresponding reduction in annualized fracture rates and there was a low fracture rate in the placebo group.

In the pediatric COSMIC study, patients had a substantially higher baseline fracture rate compared to the patients enrolled in ORBIT. In this younger patient population, meaningful improvements in BMD were associated with a reduction in annualized fracture rate for setrusumab treated patients over bisphosphonate treated patients, though the reduction did not meet statistical significance.

Additional analyses on the data across both studies are being conducted, including in other bone health and clinical endpoints beyond fractures.

63.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the above-referenced publications and investor communications. In those statements, Defendants continually claimed a high level of confidence that setrusumab's ability to increase material bone density would necessarily translate to a reduction in the annualized fracture rate of patients with type 1, 3, or 4 osteogenesis imperfecta. Defendants rested their confidence solely on the success of a Phase II study that did not have the necessary comparative power to assess whether setrumusab was the cause of any reduction in annualized fracture rates.

64.     Investors and analysts reacted immediately to Mereo's revelation. The price of Mereo's ADS declined dramatically. From a closing market price of $2.31 per share on December

26, 2025, Mereo's ADS price fell to $0.29 per share on December 29, 2025, a decline of more than

87.7%.

65.    A number of well-known analysts who had been following Mereo expressed

surprise and concern at the Company's discouraging results. In particular, Cantor published a

report titled "Disappointing Setrusumab Outcome; We Were Wrong On This Call" and lowered

the price target for Mereo to $3.00 from $6.00. The report stated, in pertinent part:

> Ultragenyx and Mereo announced the Phase 3 results for setrusumab (anti-sclerostin mAb) for osteogenesis imperfecta, where neither study (Orbit not Cosmic) achieved the primary endpoint of reduction in annualized clinical fracture rates.

66.    Similarly, Baird Equity Research published a report covering Mereo's negative

clinical trial update, lowering its price target to $1.00 from $8.00. Baird stated, in relevant part:

> This morning, Mereo announced that neither the ORBIT nor COSMIC study of setrusumab produced a statistically-significant reduction in annualized fracture rate (AFR), the key primary endpoint of these studies. While management are still working to analyze these datasets and further updates are expected in the coming weeks, given the negative top-line results of these studies, we're removing our Fresh Pick designation and reducing our probability of success for setrusumab in OI to 5%, which lowers our price target to $1/share.

67.    Furthermore, J.P. Morgan also published a report in response to Mereo's

disappointing update, in pertinent part:

> Both ORBIT and COSMIC phase 3 trials of setrusumab in OI failed to achieve stat sig in reduction in AFR (primary endpoint) compared to placebo or bisphosphonates.
>
> Interestingly, both trials did achieve statistically significant bone mineral density (BMD) improvement against placebo and bisphosphonates. Within the COSMIC trial (pediatric, 2-<7 years old), meaningful BMD improvements were associated with AFR reduction in the setrusumab cohort versus bisphosphonate cohort (not stat sig).

68.    The fact that these analysts, and others, discussed the shortfall of ORBIT and

COSMIC, as well as the uncertainties surrounding the future of the highly touted setrusumab

suggests that the public placed significant weight on Mereo's prior statements and interim drug trial results. The frequent, in-depth discussion by Mereo of the Phase 3 ORBIT and COSMIC programs, trial progress, and interim results confirms that Defendants' statements during the Class Period were material.

### *Additional Scienter Allegations*

69.    During the Class Period, Defendants acted with scienter in that they knew or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Mereo were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning setrusumab's efficacy as it relates to the reduction in annualized clinical fracture rate, both as compared to a placebo and bisphosphonate. Despite such knowledge, Defendants repeatedly conveyed to investors that both the Phase 3 ORBIT and COSMIC trials were on track to produce positive results.

70.    In fact, Defendants knew or deliberately disregarded that the efficacy of setrusumab was such that neither ORBIT nor COSMIC would achieve statistically significant results pertaining to a reduction in annualized clinical fracture rates. In particular, Defendants stated that both studies achieved statistical significance for their secondary endpoints, improvement in bone mineral density (BMD), which Defendants had previously relied on in touting setrusumab's efficacy in reducing clinical fractures.

71.    Furthermore, Defendants overtly relied on Phase 2 ORBIT top-line and interim data when touting assurances regarding the highly anticipated success of the Phase 3 ORBIT and COSMIC studies. Data that, while positive, did not have control group comparisons to distinguish results caused by setrusumab against those triggered by a mere increase in standard of care accompanied by a placebo effect. Indeed, this was the very reason the Phase 3 trials were necessary

to be conducted. Mereo's reliance on such data and alleged correlation shows that the Company knew or deliberately disregarded that setrusumab would fail to achieve the primary endpoints in both the Phase 3 ORBIT and COSMIC studies. Finally, Mereo's statement that the Company intends to conduct additional analyses focused on alternative clinical endpoints suggests that Mereo lacks confidence in setrusumab as a pharmaceutical treatment that can reduce annualized clinical fracture rates in populations suffering from OI.

### *Loss Causation and Economic Loss*

72.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Mereo's ADS and operated as a fraud or deceit on Class Period purchasers of Mereo's ADS by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Mereo's ADS materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Mereo's ADS during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

### *Presumption of Reliance; Fraud-On-The-Market*

73.    At all relevant times, the market for Mereo's ADS was an efficient market for the following reasons, among others:

(a)    Mereo's ADS met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)    Mereo communicated with public investors via established market communication mechanisms, including disseminations of press releases on

the national circuits of major newswire services and other wide-ranging

public disclosures, such as communications with the financial press and

other similar reporting services;

(c)     Mereo was followed by several securities analysts employed by major

brokerage firms who wrote reports that were distributed to the sales force

and certain customers of their respective brokerage firms during the Class

Period. Each of these reports was publicly available and entered the public

marketplace; and

(d)     Unexpected material news about Mereo was reflected in and incorporated

into the Company's ADS price during the Class Period.

74.     As a result of the foregoing, the market for Mereo's ADS promptly digested current

information regarding the Company from all publicly available sources and reflected such

information in Mereo's ADS price. Under these circumstances, all purchasers of Mereo's ADS

during the Class Period suffered similar injury through their purchase of Mereo's ADS at

artificially inflated prices, and a presumption of reliance applies.

75.     Alternatively, reliance need not be proven in this action because the action involves

omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery

pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United

States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered the omitted information important in deciding

whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

76.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with material information concerning the Company's ongoing clinical trials and viability of experimental treatments. These statements were not forward-looking and/or omitted material information about existing events and circumstances.

77.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

78.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Mereo who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Mereo's ADS during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

80.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Mereo's ADS were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Mereo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 7, 2025, there were 795.7 million shares of the Company's ordinary shares outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

81.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

82.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

83.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Mereo;

(c)    whether the Individual Defendants caused Mereo to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Mereo's ADS during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

84.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against All Defendants for Violations of

### Section 10(b) and Rule 10b-5 Promulgated Thereunder

85.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of ADS. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Mereo ADS; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Mereo's ADS at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

88.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Mereo's ADS. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

89.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

90.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Mereo's internal affairs.

91.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Mereo's businesses,

operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Mereo's ADS was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Mereo's ADS at artificially inflated prices and relied upon the price of the ADS, the integrity of the market for the ADS and/or upon statements disseminated by Defendants, and were damaged thereby.

92.    During the Class Period, Mereo's ADS was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Mereo's ADS at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ADS, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Mereo's ADS was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Mereo's ADS declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

93.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

94.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's ADS during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Mereo's misstatements.

97.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Mereo which had become materially false or misleading.

98.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Mereo disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Mereo to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Mereo's ADS.

99.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Mereo to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

100.    By reason of the above conduct, the Individual Defendants and/or Mereo are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 4, 2026                          Respectfully submitted,

**LEVI & KORSINSKY, LLP**

_/s/ Adam M. Apton_ _
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*