**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN ELLIOTT, Individually and on Behalf of All Others Similarly Situated,<br>Plaintiff,<br><br>v.<br><br>MEREO BIOPHARMA GROUP PLC, DENISE SCOTS-KNIGHT, and JOHN A. LEWICKI,<br><br>Defendants. | Case No: 1:26-cv-00988-ALC<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

# Table of Contents

**Pages**

I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 6

III. PARTIES ........ 6

IV. DEFENDANTS' FRAUDULENT SCHEME ........ 8

A. Osteogenesis Imperfecta and Bone Structure ........ 8

B. Mereo Bio and Setrusumab to Treat OI ........ 11

C. The Scientific Literature on BMD and OI Fracture Rates ........ 12

D. The ASTEROID Phase 2b Study ........ 16

E. Proper Trial Protocol to Assess Drug Efficacy ........ 17

F. The Orbit Phase 2 Study ........ 21

G. The Orbit and Cosmic Phase 3 Studies ........ 26

H. Defendants Sell ADSs at Inflated Prices ........ 27

I. The Phase 3 Results and Mereo's ADS Price Collapse ........ 28

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ........ 30

VI. LOSS CAUSATION ........ 47

VII. PLAINTIFFS' CLASS ACTION ALLEGATIONS ........ 50

VIII. CAUSES OF ACTION ........ 53

IX. PRAYER FOR RELIEF ........ 56

X. JURY TRIAL DEMANDED ........ 56

Court-appointed Lead Plaintiff Brian Elliott ("Lead Plaintiff") and additional Plaintiffs Michael Davis and Shahab Hillyer (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Mereo Biopharma Group PLC ("Mereo", "Mereo Bio", or the "Company"), consultation with an appropriate expert, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Mereo American Depositary Shares ("ADSs") between October 14, 2023 and December 26, 2025, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").[1]

2. Mereo Bio is a biopharmaceutical company focused on the development of therapeutics to treat rare diseases. Mereo's pipeline consists of two pre-revenue, clinical stage drugs, one of which is setrusumab for the treatment of osteogenesis imperfecta ("OI"). This case concerns Defendants' false and misleading statements to investors regarding the efficacy of setrusumab and its ability to reduce fractures in patients suffering from OI.

[1] All emphases are added unless otherwise indicated.

3. Osteogenesis imperfecta is a group of genetic disorders that cause reduced or abnormal collagen, resulting in bones that are brittle and prone to a high rate of fractures.

4. Bone is made of two major components: (i) collagen, which provides flexibility and structure, and (ii) mineral, which provides hardness and strength. A helpful analogy is reinforced concrete: The steel rebar is like collagen in bone, it provides a flexible framework that resists cracking. The concrete is like mineral in bone, it provides compressive strength and rigidity. A strong building needs both. *See* § IV.A.

5. Mereo's setrusumab has been shown to increase bone mineral density ("BMD") in patients suffering from osteogenesis imperfecta. Mereo posited that improved BMD would lead to bettering the lives of OI patients by making bones stronger and reducing the fracture rate in patients suffering from the disease.

6. Bone mineral density is a good surrogate for the strength and health of bone in ***most*** people. For instance, a 2020 paper published in *The Lancet* recognized that improving BMD reduced fracture rates in patients suffering from osteoporosis: "Treatment-related BMD changes are strongly associated with fracture reductions across randomised trials of osteoporosis therapies with differing mechanisms of action." Accordingly, Mereo investors had reason to believe that because setrusumab improved BMD this would translate into stronger bones and fewer fractures in OI patients. During the Class Period, Defendants repeatedly reinforced this connection.

7. The Class Period begins on October 14, 2023, when Mereo and its partner, Ultragenyx, revealed the 6-month data for the Orbit Phase 2 trial of setrusumab in patients with OI. In the press release Defendants claimed setrusumab "significantly reduced incidence of fractures" and proclaimed the "reduction in annualized fracture rates was associated with a clinically meaningful increase in BMD." "These data provide ***compelling evidence*** that improved

bone mineral density, resulting from this unique mechanism of action, reduced the risk of fractures and that treatment with setrusumab could allow patients with OI to lead much more active lives with fewer fractures."

8. The truth is that Defendants did not have a sound scientific basis for making these statements. While BMD is a good proxy for bone health in ***most*** people, the scientific literature does ***not*** establish that increased BMD is a good measure of bone health in patients suffering from OI, or that increased BMD results in reduced fracture rates in patients suffering from osteogenesis imperfecta. For example, a 2016 academic review of 14 trials involving OI patients concluded: "The results from the included trials provide evidence for statistically significant improvement in BMD in individuals affected with OI when treated with either oral or IV bisphosphonates. ***It remains to be seen whether this increase in BMD is a surrogate marker for fracture reduction and clinical functional improvement***." *See* Dwan K, Phillipi CA, Steiner RD, Basel D. Bisphosphonate therapy for osteogenesis imperfecta. Cochrane Database of Systematic Reviews. 2016;10:CD005088. doi:10.1002/14651858.CD005088.pub4. PMID: 27760454.

9. Additional academic studies have likewise found no correlation between increased BMD and a reduction in fracture rates with respect to OI patients. *See* § IV.C.

10. Accordingly, it was misleading for Defendants to repeatedly tell investors setrusumab increased BMD, ***and*** that this increase in BMD would translate to stronger and healthier bones in patients with OI that would be more resistant to fractures.

11. Defendants also misled investors by claiming the results of the Phase 2 Orbit trial showed setrusumab reduced fracture rates in patients with OI. The Orbit Phase 2 trial data showed no such thing. Clinical trials answer only the scientific questions they are designed to answer. The protocol defines those questions. Phase 2 of the Orbit trial simply was not designed to assess

whether setrusumab reduced fracture rates, and it could reach no such conclusion. The Orbit Phase 2 trial protocol had one primary outcome measure and eleven secondary outcome measures that Orbit Phase 2 was designed to assess. ***Not one*** of the Orbit Phase 2 outcome measures addressed whether setrusumab reduced fracture rates. The Phase 2 Orbit trial had only 24 participants and no control group. The Phase 2 Orbit trial (as set forth in the protocol) was designed to assess the optimal dosage for moving forward to the Phase 3 Orbit trial. The Phase 3 Orbit trial, which would enroll far more patients and include a control group, was specifically designed to address whether setrusumab reduced fracture rates in patients with OI. The Phase 2 portion of the Orbit study did not have enough participants or a control group, both of which were necessary to establish a causal relationship between setrusumab and a reduction in fracture rates in OI patients. Accordingly, the protocol itself demonstrates that Orbit Phase 2 was not intended to establish fracture efficacy. *See* § IV.F.

12. Similarly, in April 2024, Mereo Biopharma's Chief Executive Officer Denise Scots-Knight ("Scots-Knight") told investors that the Orbit Phase 2 data established that setrusumab's ability to increase bone mineral density in patients with osteogenesis imperfecta did in fact translate to the real tangible benefit of reducing fracture rates in patients with osteogenesis imperfecta:

> I think this data answered a lot of questions.
>
> This was after only six months treatment and it answered a lot of questions because we've had a lot of discussion around how setrusumab, which increases BMD, we've shown that in a lot of [statistics] in Phase 2 of a study in adults, and ***how that BMD change would actually translate into reduction in fractures in osteogenesis imperfecta***. It's been seen, everybody believes that happens in osteoporosis, ***but would that translate in OI? And indeed it did, so that really derisked the program, derisked the ongoing Phase 3 study***.

13. Speaking of the Orbit Phase 2 data, Mereo Biopharma's Chief Scientific Officer John Lewicki ("Lewicki") told investors in January 2025: "***The reality is once patients are treated with setrusumab, fractures become very infrequent.***" And, in June 2025, Lewicki told investors quite simply that the way to interpret the Phase 2 Orbit data was clear, "***the key thing is patients stop fracturing***."

14. Defendants were jumping to conclusions about the Orbit Phase 2 data. Defendants misled investors; the truth was that the Orbit Phase 2 trial was neither designed to nor could it establish whether setrusumab reduced fracture rates in OI patients.

15. Throughout the Class Period, Mereo was a development stage company without revenue that had generated operating losses from its inception, resulting in cumulative carry-forward tax losses of $151.3 million as of year-end 2022. As such, Mereo was highly dependent on raising capital from investors to continue operations. For instance, Mereo's annual report for 2023 (filed with the Securities and Exchange Commission "SEC" on March 27, 2024) stated:

> While we have raised approximately $209 million since 2020 through private placements of ordinary shares and convertible loan notes in 2020, a public offering of ADSs in February 2021 and an "at-the-market" offering of ADSs in 2023, we expect our expenses to increase substantially in connection with our ongoing activities, particularly as we continue to advance our rare disease portfolio. In addition, if we obtain marketing approval for product candidates where we retain commercial rights, we expect to incur significant commercialization expenses related to product sales, marketing, distribution and manufacturing. Furthermore, we expect to continue to incur additional costs associated with operating as a publicly traded company in the U.S. and maintaining a listing on Nasdaq. ***Accordingly, we will need to obtain substantial additional funding in connection with our continuing operations***.

16. Against this backdrop, Defendants' enthusiastic statements about the Orbit Phase 2 data caused Mereo's ADSs to trade at artificially inflated prices during the Class Period, and Defendants took advantage of those inflated prices – with Mereo selling over 22 million ADSs to the public and Defendants selling sizable portions of their own ADSs. *See* § IV.H.

17. Ultimately, the market learned that Defendants' statements were false when the Orbit Phase 3 trial data was released showing setrusumab did not in fact reduce fracture rates in a statistically meaningful way. When this data was released – first in an interim report of data on July 9, 2025 and then the final report of data on December 26, 2025 – Mereo's ADS price collapsed by 42.5% and 87.7%, respectively. *See* § IV.I.

18. This action seeks to recover investor losses resulting from Defendants' misrepresentations about the effectiveness of setrusumab.

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

22. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

23. Plaintiffs, as set forth in Lead Plaintiff's previously filed Certification (ECF No. 19-2) and in the attached Exhibits A and B, incorporated by reference herein, purchased Mereo

ADSs during the Class Period and were economically damaged thereby.

24. Defendant Mereo is a public limited company incorporated and domiciled in the U.K., and registered in England. During the Class Period, Mereo's public ADSs traded on the Nasdaq Capital Market via ADSs under the ticker symbol "MREO".

25. Defendant Denise Scots-Knight ("Scots-Knight") was, at all relevant times, the cofounder, board member, and Chief Executive Officer of Mereo.

26. Defendant John A. Lewicki ("Lewicki") was, at all relevant times, the Chief Scientific Officer of Mereo.

27. Defendants Scots-Knight and Lewicki are collectively referred to herein as the "Individual Defendants."

28. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

29. Mereo is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

30. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

31. Mereo and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. DEFENDANTS' FRAUDULENT SCHEME

### A. Osteogenesis Imperfecta and Bone Structure

32. Osteogenesis Imperfecta (OI) includes a group of genetic disorders impacting bone metabolism. Approximately 85% to 90% of OI cases are caused by mutations in the COL1A1 or COL1A2 genes, leading to either reduced or abnormal collagen and changes in bone metabolism. The collagen mutations in OI can result in increased bone brittleness, which contributes to a high rate of fractures, including at atypical sites. Patients with OI also exhibit increased bone resorption (breakdown of old bone) and inadequate production of new bone, which leads to decreased bone mass, bone fragility and weakness.

33. OI is also known as brittle bone disease. In severe cases, patients may experience hundreds of fractures in a lifetime. In addition, people with OI often suffer from muscle weakness, early hearing loss, fatigue, curved bones, scoliosis (curved spine), brittle teeth, respiratory problems and short stature. The disease can be extremely debilitating and even fatal in newborn infants with a severe form of the disease. OI is a rare condition that affects an estimated 60,000

people in the U.S. and Europe, according to estimates by Orphanet.

34. There are eight recognized forms of OI, designated type I through type VIII. Type I is cited to be the least severe form, although patients can still have many fractures and other physical manifestations of the disease, while Type II is the most severe and frequently causes death at or shortly after birth. Type I is the most prevalent and estimated to occur in approximately 50% to 60% of OI patients. Type III and Type IV patients may be wheelchair bound and typically have many fractures throughout their lifetime. Type III and Type IV patients may also have short stature, scoliosis and hearing loss by the time they are young adults. OI is typically diagnosed at birth with most patients being born with a blue or gray tint to the sclera, the part of the eye that is usually white.

35. There are no therapies approved by the FDA or European Medical Association for the treatment of OI. The only treatments available to OI patients are the acute management of fractures as they occur and drugs such as bisphosphonates, which are typically used to treat osteoporosis and are not approved for OI but are commonly used off-label in both children and adults. Bisphosphonates slow down the rate at which osteoclasts resorb bone. That means bisphosphonates reduce the activity of the cells (osteoclasts) that break down (resorb) bone. Bisphosphonates have not consistently been shown to reduce fractures in pediatric or adult OI patients and the effect of long-term therapy with these drugs remains unclear in both children and adults.

36. Bone is made of two major components: (i) collagen, which provides flexibility and structure, and (ii) mineral (primarily calcium phosphate in the form of hydroxyapatite), which provides hardness and strength.

37. A helpful analogy is reinforced concrete: The steel rebar is like type I collagen, it provides a flexible framework that resists cracking. The concrete is like the mineral, it provides compressive strength and rigidity. A strong building needs both.

38. The Osteogenesis Imperfecta Foundation published a paper in November 2022, describing the structure of bone and OI's impact on that structure as follows:

> The structure of bone is very similar to reinforced concrete that is used to make a building or a bridge. When the building or bridge is first assembled, an initial frame that contains long steel rods is put in place. Cement is then poured around these steel rods. The rods and the cement form a tight union, producing a structure that is strong but resilient enough to withstand some rocking motion while maintaining strength. Without the steel rods, the cement would be brittle and fracture with only minor movement. Without the cement, the steel rods would have inadequate support and would bend.
>
> The same organization is true of bone. Collagen rods in bone are similar to the steel rods that support the building. The minerals, including calcium and phosphorous from the blood, that crystallize and surround the rods play the same role as the cement that surrounds and supports steel rods in a building. These minerals give the bones strength while the collagen rods provide resiliency. Diseases that interfere with the ability of calcium and phosphorous to be deposited around the collagen rods yield bones that bend, but do not necessarily break. These diseases are usually diagnosed as "rickets" and are seen in patients who are deficient in vitamin D.
>
> Diseases in which the collagen rods are abnormal produce brittle bones and fall under the category of osteogenesis imperfecta (OI). ***To understand OI, it is essential to understand why the collagen rods are abnormal and how the abnormal rods affect the structure of bone.***
>
> * * *
>
> In OI, the collagen fibers that form the rods are either "kinked" or broken, so that the structure is inherently unstable.
>
> * * *
>
> In summary, the more severe forms of OI are caused by genetic mutations that produce bad structural components or bad collagen fibers that become part of the skeleton. A major advance in treating OI will be to find a way to prevent the bad fibers from being made in the first place. If this objective could be achieved, the result would be Type I OI, with the person having one normal collagen gene that produces a smaller number of normal collagen fibers instead of defective fibers.

> Once this goal is accomplished, medicines to stimulate more collagen fiber production from the remaining normal collagen gene might increase bone strength even more.

39. As detailed in the next section, Mereo Bio's experimental drug setrusumab improved bone mineral density (the cement), but did not address the underlying issue with OI patients, abnormal collagen rods (the rebar) affecting the structure of their bones.

### B. Mereo Bio and Setrusumab to Treat OI

40. Mereo is a biopharmaceutical company focused on the development of therapeutics for rare diseases.

41. Mereo Bio was founded in March 2015, after raising financing from investors. It soon acquired three clinical stage development drugs from Novartis.

42. Mereo Bio acquired the rights to setrusumab (then known as BPS-804) for the treatment of OI from Novartis in July 2015.

43. On December 17, 2020, Mereo entered into a license and collaboration agreement with Ultragenyx, under which Ultragenyx would lead future global development of setrusumab in both pediatric and adult patients. Mereo granted Ultragenyx an exclusive license to develop and commercialize setrusumab in the U.S. and rest of the world, excluding Europe, where Mereo retained commercial rights. Under the terms of the agreement, Ultragenyx made an upfront payment of $50 million to Mereo and a $9.0 million payment during the year ended December 31, 2023 upon achievement of a clinical milestone. Ultragenyx agreed to pay up to $245 million in additional development, regulatory and commercial milestones and tiered double-digit percentage royalties to Mereo on net sales outside of Europe.

44. According to Mereo Bio, setrusumab is a fully human monoclonal antibody administered by IV that inhibits sclerostin, a protein that acts on a key bone-signaling pathway by

inhibiting the activity of bone-forming cells and promoting bone resorption.

45. In multiple press releases during the Class Period, Ultragenyx and Mereo Bio described the reasoning behind treating OI with a drug that inhibited sclerostin:

> The goal of blocking inhibitory effects of sclerostin is to increase new bone formation, bone mineral density and bone strength. Sclerostin inhibition also reduces excessive bone resorption, further enhancing its impact on bone density. In mouse models of OI, the use of anti-sclerostin antibodies was shown to stimulate bone formation, improve bone mass and density, and increase bone strength against fracture force testing.

46. Mereo's stated belief was that setrusumab would increase new bone formation, BMD, and bone strength, and that this would translate to an improved quality of life for OI patients by reducing fracture rates.

47. Setrusumab was critical to Mereo Bio. Thus, the development, testing and related data concerning Setrusumab was closely monitored by, among others, Defendants Scots-Knight and Lewicki. Mereo itself acknowledged that its future depended on setrusumab. According to the Company's 2024 Form 10-K: "We depend heavily on the success of setrusumab and alvelestat. . . . We do not currently generate any revenue from sales of any product candidates, and we may never be able to develop or commercialize a marketable product. We have invested substantially all of our efforts and financial resources in the acquisition and development of setrusumab and alvelestat . . . ."

### C. <u>The Scientific Literature on BMD and OI Fracture Rates</u>

48. BMD is a good surrogate for the strength and health of bone in most people. For instance, a 2020 paper published in the Lancet concluded that the treatment related changes of BMD in ***osteoporosis*** (not OI) patients is a good surrogate for fracture rates. The authors concluded:

> Treatment-related BMD changes are strongly associated with fracture reductions across randomised trials of osteoporosis therapies with differing mechanisms of action. These analyses support BMD as a surrogate outcome for fracture outcomes in future randomised trials of new osteoporosis therapies and provide an important demonstration of the value of public access to individual patient data from multiple trials.
>
> Foundation for the National Institutes of Health Bone Quality Project, Black DM, Bauer DC, Vittinghoff E, et al. Treatment-related changes in bone mineral density as a surrogate biomarker for fracture risk reduction: meta-regression analyses of individual patient data from multiple randomised controlled trials. Lancet Diabetes Endocrinol. 2020;8(8):672-682. doi:10.1016/S2213-8587(20)30159-5.

49. The NIH Bone Quality Project reported in The Lancet Diabetes & Endocrinology that treatment-related changes in BMD were strongly associated with fracture-risk reduction across 23 randomized osteoporosis trials involving more than 90,000 patients with osteoporosis.

50. Accordingly, for this reason it was reasonable to expect that investors would believe Defendants' Class Period statements that because setrusumab increases BMD in OI patients, this would lead to decreased fracture rates.

51. At the time Defendants made the challenged statements, investors had reason to view increases in bone mineral density as clinically meaningful. Against that backdrop, statements linking setrusumab-induced increases in BMD with reductions in fracture incidence would have been consistent with generalized statements regarding BMD and bone health, even though the scientific literature casts significant doubt on the applicability of that paradigm to osteogenesis imperfecta.

52. Importantly, OI is different than ordinary osteoporosis. Osteogenesis Imperfecta is caused by a mutation in the COL1A1 or COL1A2 genes, which results in reduced or dysfunctional type 1 collagen. Type 1 collagen provides bone with structure, flexibility, and resistance to cracking. Measures of BMD do not necessarily reflect the strength of bone if the type 1 collagen is defective. Accordingly, it is an open question in the scientific literature whether drugs that

improve BMD actually help OI patients by reducing fracture rates.

53. In 2016, researchers conducted a Cochrane review of the results of fourteen studies of patients with OI being treated with bisphosphonates to assess the effectiveness and safety of bisphosphonates in increasing bone mineral density, reducing fractures and improving clinical function in people with osteogenesis imperfecta. *See* Dwan K, Phillipi CA, Steiner RD, Basel D. Bisphosphonate therapy for osteogenesis imperfecta. Cochrane Database of Systematic Reviews. 2016;10:CD005088. doi:10.1002/14651858.CD005088.pub4. PMID: 27760454. This study is referred to herein as the "Cochrane Review."

54. The Cochrane Review stated: "This review looked at trials studying one of the groups of medications known as bisphosphonates which are more typically used to treat osteoporosis. They are used in osteogenesis imperfecta to try and reduce the number of bone fractures in affected individuals."

55. The Cochrane Review found: "Each trial independently showed ***significant improvements in bone mineral density*** after treatment with oral or intravenous bisphosphonates." However, despite OI patients showing increased BMD, the patients did not experience reduced rates of fractures. "We included 14 trials, ***and most of these did not show a major reduction in fractures*** in affected individuals when treated with bisphosphonates."

56. The Cochrane Review concluded:

> Bisphosphonates are commonly prescribed to individuals with osteogenesis imperfecta. Current evidence, albeit limited, demonstrates oral or intravenous bisphosphonates ***increase bone mineral density*** in children and adults with this condition. These were not shown to be different in their ability to increase bone mineral density. ***It is unclear whether oral or intravenous bisphosphonate treatment consistently decreases fractures***, though multiple studies report this independently and no studies report an increased fracture rate with treatment.

57. The Cochrane Review also concluded:

> The results from the included trials provide evidence for ***statistically significant improvement in BMD*** in individuals affected with OI when treated with either oral or IV bisphosphonates. ***It remains to be seen whether this increase in BMD is a surrogate marker for fracture reduction and clinical functional improvement***. At this time, comparative data remains inconclusive though several trials reported here individually show improvements in fracture incidence.

58. Since the Cochrane Review was published in 2016, other studies have been conducted to try to answer the question of whether improved BMD leads to reduced fracture rates in patients suffering from OI.

59. In August 2023, PLOS ONE – a peer-reviewed, open-access journal published by the Public Library of Science (PLOS) – published an article titled "Association of trabecular bone score and bone mineral apparent density with the severity of bone fragility in children and adolescents with osteogenesis imperfecta: A cross-sectional study" which studied 42 children and adolescents with OI to assess whether BMD (and other metrics) correlated with fracture rates ("FR"). The study found that height-adjusted BMD Z-scores ("BMDHAZ"), widely considered the conventional means of measuring BMD in patients with OI, had ***no*** correlation to fracture rates. The paper concluded: "***No correlation between the BMDHAZ and FR was observed in both groups***." While the BMDHAZ method of measuring BMD was not utilized in Mereo's studies (ASTEROID, Orbit, or Cosmic), the study results call into question whether setrusumab's ability to improve BMD could reasonably be expected to improve fracture rates.

60. Drugs that improve BMD in OI patients (such as setrusumab) do not necessarily address the underlying issue of abnormal Type 1 collagen caused by the OI patient's gene mutation, and therefore increased BMD may not be indicative of stronger bones because the underlying structure of the bone remains abnormal and/or defective.

61. Going back to the analogy of reinforced concrete, setrusumab added solid cement (bone mineral density) but did not fix the broken steel rebar (collagen) that was necessary to provide structure and flexibility to the cement.

62. Accordingly, when setrusumab Phase 3 trials ultimately failed in December 2025, BioPharma International ran a story titled: "Ultragenyx Phase III Data Reveal Limits of Bone Density Endpoints in Rare Bone Disease" that commented about setrusumab increasing BMD but failing to provide the clinical benefits doctors, patients, and investors had been led to believe would follow: "The divergence between BMD improvements and fracture outcomes raises questions relevant to the broader biopharmaceutical industry. Regulators and developers continue to debate whether bone density can serve as a reliable surrogate endpoint in rare skeletal disorders, particularly when fracture events are infrequent or variable over time."

**D. <u>The ASTEROID Phase 2b Study</u>**

63. In 2019, prior to the Class Period, Mereo conducted a Phase 2b study titled ASTEROID, which enrolled 112 adult patients with Type I, III, and IV OI to take setrusumab. Mereo described ASTEROID as follows:

> ASTEROID was a 12-month, randomized, double-blind, Phase 2b dose-finding study in 112 adults diagnosed with type I, III or IV Osteogenesis Imperfecta and a confirmed COL1A1/COL1A2 mutation who have fractured over the previous 5 years. The primary endpoint of the study was the change over baseline in Tr vBMD of the wrist at 12 months, assessed using HR-pQCT. Change from baseline at 6 and 12 months for areal BMD at the lumbar spine, as measured by DXA, was an important secondary endpoint. Additional secondary endpoints included HR-pQCT parameters (such as total vBMD), bone biomarkers, patient reported outcomes (PRO) and quality of life measures. Fracture data were also collected throughout the duration of the study, although the trial was not statistically powered for fractures.

64. On November 11, 2019, Mereo issued a press related titled "Mereo BioPharma's Setrusumab Demonstrates Dose-Dependent Bone Building and Trend in Fracture Reduction in

Phase 2b ASTEROID Study in Adults with Osteogenesis Imperfecta." The press release stated: "Although the ASTEROID study was not powered to show a difference in fracture rates, a trend of reduction in fractures was observed in the high dose cohort."

65. On July 16, 2024, the *Journal of Bone and Mineral Research* published a peer-reviewed assessment of the ASTEROID Phase 2b study titled: "Setrusumab for the treatment of osteogenesis imperfecta: 12-month results from the phase 2b asteroid study." The authors of the peer-reviewed paper noted the possibility that setrusumab's BMD building quality translated to an actual reduction of fractures, but noted that such conclusions could not be inferred from the data.

> ***This study was limited by the lack of a placebo comparator group***. Nevertheless, otherwise healthy adults with OI are expected to have a relatively stable skeletal status over a 12- mo period, and the evaluation of significant changes from baseline in Asteroid is likely appropriate. ***The study was also limited in its ability to determine the effect of setrusumab on fracture rate***. Although a reduction in fracture rates is suggestive in the 20 mg/kg subgroup, ***the study was not powered to detect a significant effect***. Larger and/or longer studies or studies in patients with OI who have higher predicted fracture rates are required to overcome potentially confounding aspects of fracture rate detection and demonstrate a significant reduction.

66. During the Class Period, Mereo's SEC filings stated: "The results of this [ASTEROID] Phase 2b trial supported the progression of setrusumab into a pivotal study in OI."

67. The Asteroid Phase 2b study was not powered to determine whether setrusumab caused a decrease in fracture rates in patients with OI. Mereo and academics properly noted this important distinction when publicly describing the Asteroid Phase 2b data. How Defendants described the data from Asteroid Phase 2b is in stark contrast to what they would later say about the Orbit Phase 2 data.

**E. <u>Proper Trial Protocol to Assess Drug Efficacy</u>**

68. FDA Regulation 21 C.F.R. § 314.126 lays out the framework for properly assessing the efficacy of experimental drugs. It explains in sub-section (a) the rationale for sticking to

recognized scientific methods for evaluating efficacy:

> The purpose of conducting clinical investigations of a drug is to distinguish the effect of a drug from other influences, such as spontaneous change in the course of the disease, placebo effect, or biased observation. The characteristics described in paragraph (b) of this section have been developed over a period of years and are ***recognized by the scientific community as the essentials of an adequate and well-controlled clinical investigation***. The Food and Drug Administration considers these characteristics in determining whether an investigation is adequate and well-controlled for purposes of sections 505 and 507 of the act. Reports of adequate and well-controlled investigations provide the primary basis for determining whether there is "***substantial evidence***" ***to support the claims of effectiveness for new drugs and antibiotics***. Therefore, the study report should provide sufficient details of study design, conduct, and analysis to allow critical evaluation and a determination of whether the characteristics of an adequate and well-controlled study are present.

69. FDA Regulation 21 C.F.R. § 314.126(b) identifies the "characteristics" of a "adequate and well-controlled study." FDA Regulation 21 C.F.R. § 314.126(b)(1) states: "There is a clear statement of the objectives of the investigation and a summary of the proposed or actual methods of analysis in the protocol for the study and in the report of its results."

70. FDA Regulation 21 C.F.R. § 314.126(b)(2) states: "The study uses a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect."

71. Furthermore, FDA Regulation 21 C.F.R. § 314.126(e) states: "Uncontrolled studies or partially controlled studies are not acceptable as the sole basis for the approval of claims of effectiveness."

72. As set forth in the next section, FDA Regulation 21 C.F.R. § 314.126 is relevant to Defendants' statements concerning the data from the Orbit Phase 2 trial of setrusumab because the Phase 2 Orbit study (i) did not identify reduction in fracture rates as one of its trial objections, and (ii) did not utilize a control group as required by 21 C.F.R. § 314.126(b).

73. Additionally, the FDA has expressly adopted the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use E9 ("ICH E9").

74. With respect to sample sizing, the ICH E9 statistical principles states:

> The number of subjects in a clinical trial should always be large enough to provide a reliable answer to the questions addressed. ***This number is usually determined by the primary objective of the trial.*** If the sample size is determined on some other basis, then this should be made clear and justified.

75. ICH E9 was revised in 2019, in what is known as ICH E9 (R1), titled Addendum on Estimands and Sensitivity Analysis in Clinical Trials to the Guideline on Statistical Principles for Clinical Trials. ICH E9 (R1) states as its purpose and scope, the following:

> To properly inform decision making by pharmaceutical companies, regulators, patients, physicians and other stakeholders, clear descriptions of the benefits and risks of a treatment (medicine) for a given medical condition should be made available. Without such clarity, there is a concern that the reported "treatment effect" will be misunderstood. This addendum presents a structured framework to strengthen the dialogue between disciplines involved in the formulation of clinical trial objectives, design, conduct, analysis and interpretation, as well as between sponsor and regulator regarding the treatment effect(s) of interest that a clinical trial should address.
>
> Precision in describing a treatment effect of interest is facilitated by constructing the "estimand" (see Glossary; A.3.) corresponding to a clinical question of interest.
>
> * * *
>
> The statistical analysis of clinical trial data should be aligned to the estimand. This addendum clarifies the role of "sensitivity analysis" (see Glossary) to explore robustness of conclusions from the main statistical analysis.

76. ICH E9 (R1) defines an "estimand" as follows: "A precise description of the treatment effect reflecting the clinical question posed by the trial objective. It summarises at a population-level what the outcomes would be in the same patients under different treatment conditions being compared."

77. In addition, ICH E9 (R1) states:

> Trial planning should proceed in sequence (Figure 1). Clear trial objectives should be translated into key clinical questions of interest by defining suitable estimands. An estimand defines the target of estimation for a particular trial objective (i.e. "what is to be estimated", see A.3.). A suitable method of estimation (i.e. the

analytic approach, referred to as the main "estimator", see Glossary) can then be selected (see A.5.1.). The main estimator will be underpinned by certain assumptions. To explore the robustness of inferences from the main estimator to deviations from its underlying assumptions, a sensitivity analysis should be conducted, in the form of one or more analyses, targeting the same estimand (see A.5.2.).

* * *

This framework enables proper trial planning that clearly distinguishes between the target of estimation (trial objective, estimand), the method of estimation (estimator), the numerical result ("estimate", see Glossary), and a sensitivity analysis. This will assist sponsors in planning trials, regulators in their reviews, and will enhance the interactions between these parties when discussing the suitability of clinical trial designs, and the interpretation of clinical trial results. The specification of appropriate estimands (see A.3.) will usually be the main determinant for aspects of trial design, conduct (see A.4.) and analysis (see A.5.).

78. Trial design, as clearly stated in the ICH E9 (R1) guidelines directly flows from the identification of the estimand(s).

The design of a trial needs to be aligned to the estimands that reflect the trial objectives. A trial design that is suitable for one estimand might not be suitable for other estimands of potential importance. Clear definitions for the estimands on which quantification of treatments effects will be based should inform the choices that are made in relation to trial design.

79. The ICH E9 (R1) guidelines clearly state that the estimands should be identified in the trial protocol:

***A trial protocol should define and specify explicitly a primary estimand that corresponds to the primary trial objective***.

* * *

The choice of the primary estimand will usually be the main determinant for aspects of trial design, conduct and analysis. Following usual practices, these aspects should be well documented in the trial protocol. ***If secondary estimands are of key interest, these considerations may be extended to support these as needed and should be documented as well.***

80. As set forth in the next section, ICH E9 and ICH E9 (R1) are relevant to Defendants' statements concerning the data from the Orbit Phase 2 trial of setrusumab because the

Phase 2 Orbit study protocol did ***not*** define fracture rate as one of the estimands to be studied in the Orbit Phase 2 trial. Fracture rate was not the primary outcome measure in the Orbit Phase 2 trial protocol. Fracture rate (or some derivation thereof) was not even one of the ***eleven*** secondary outcomes measures identified in the Phase 2 Orbit protocol.

81. As set forth in the FDA regulation 21 C.F.R. § 314.126 and ICH E9 and ICH E9 (R1), properly defining the "primary objective of the trial" or the "estimand" was absolutely essential to developing a trial that could accurately assess whether setrusumab reduces fracture rates in persons with OI.

82. As set forth in the FDA regulation 21 C.F.R. § 314.126 and ICH E9 and ICH E9 (R1), ***the protocol defines the scientific question the trial is designed to answer***.

83. Orbit Phase 2 was not designed to answer the question of whether setrusumab reduces fracture rates in persons with OI. Defendants clearly knew that Orbit Phase 2 was not designed to answer this question, and yet represented to the public anyway that the Orbit Phase 2 data showed setrusumab did in fact reduce fracture rates in persons with OI. Accordingly, Defendants' repeated statements that Orbit Phase 2 demonstrated fracture efficacy represented that the study had answered a scientific question that, under its own protocol, it was never designed to answer.

## F. <u>The Orbit Phase 2 Study</u>

84. The Orbit study is both a Phase 2 and Phase 3 study. The initial Phase 2 study protocol was published on the FDA's website on November 8, 2021. Ultragenyx and Mereo Bio announced the dosing of the first patient in April 2022.

85. Prior to the Class Period, on June 5, 2023, Mereo published initial Orbit Phase 2 data. Mereo published a press release (subsequently filed with the SEC) titled "Ultragenyx and

Mereo BioPharma Announce Positive Data from the Ongoing Phase 2/3 Orbit Study of Setrusumab (UX143) in Osteogenesis Imperfecta (OI)." According to the press release, setrusumab demonstrated a substantial and significant improvement in bone mineral density, which Defendants cited as evidence that setrusumab was working to help OI patients build stronger, healthier bones.

86. Mereo and Ultragenyx followed up the June 5, 2023 press release with an October 14, 2023 press release titled: "Ultragenyx and Mereo BioPharma Announce Interim Phase 2 Data from Phase 2/3 Orbit Study Demonstrating Setrusumab (UX143) Significantly Reduced Fracture Rates in Patients with Osteogenesis Imperfecta (OI)" and subtitled " Phase 2 data presented at ASBMR 2023 show treatment with setrusumab resulted in ***67% reduction in annualized fracture rate associated with continuous and meaningful improvements in bone mineral density (BMD)***." The press release told investors that setrusumab reduced fracture rates in OI patients. "Ultragenyx Pharmaceutical Inc. (NASDAQ: RARE) and Mereo BioPharma Group plc (NASDAQ: MREO) today announced interim data from the Phase 2 portion of the Phase 2/3 Orbit study ***demonstrating that treatment with setrusumab (UX143) significantly reduced incidence of fractures in patients with OI*** with at least 6 months of follow-up and continues to demonstrate ongoing and meaningful improvements in lumbar spine bone mineral density (BMD)."

87. The October 14, 2023 press release continued:

> ***The reduction in annualized fracture rates was associated with a clinically meaningful increase in BMD***. . . .
>
> "***These data provide compelling evidence that improved bone mineral density, resulting from this unique mechanism of action, reduced the risk of fractures and that treatment with setrusumab could allow patients with OI to lead much more active lives with fewer fractures***," said Eric Crombez, M.D., chief medical officer at Ultragenyx.

88. On June 11, 2024, Ultragenyx and Mereo issued a public press release titled: "Ultragenyx and Mereo BioPharma Announce New Phase 2 Data from Phase 2/3 Orbit Study ***Demonstrating Sustained Reductions in Fracture Rates*** Following Treatment with Setrusumab (UX143) in Patients with Osteogenesis Imperfecta (OI)". The first sub-heading stated: "14-month data ***show treatment with setrusumab resulted in a large, sustained 67% reduction in annualized fracture rate*** and persistent median annualized fracture rate of 0.00 (p=0.0014)." The press release misleadingly told investors that the data demonstrated setrusumab reduced fracture rates.

> Ultragenyx Pharmaceutical Inc. (NASDAQ: RARE) and Mereo BioPharma Group plc (NASDAQ: MREO) today announced positive 14-month results from the Phase 2 portion of the ongoing Phase 2/3 Orbit study (NCT05125809) ***demonstrating*** that, as of a May 24, 2024 data cut-off date, ***treatment with setrusumab (UX143) continued to significantly reduce incidence of fractures in patients with OI*** with at least 14 months of follow-up. Treatment with setrusumab also resulted in ***ongoing and meaningful improvements in lumbar spine bone mineral density (BMD)*** at month 12 without evidence of plateau.
>
> * * *
>
> The ***reduction in annualized fracture rates was associated with continued, clinically meaningful increases in BMD***.

89. During the Class Period, Defendants repeatedly referenced the results of the Orbit Phase 2 trial as establishing that setrusumab both increased BMD ***and*** reduced fracture rates in patients with OI. *See* § V.

90. These statements were misleading for two independent reasons. ***First***, to assert that the "reduction in annualized fracture rates was associated with continued, clinically meaningful increases in BMD" improperly suggested a cause-and-effect relationship that improving BMD caused reduced fractures, which has not been established in OI patients. As detailed in Section IV.C., there is insufficient scientific evidence to establish a causal link between increased BMD and decreased fracture rates in OI patients. Defendants knew the scientific evidence does not

establish a causal link between BMD and fracture rates in OI patients. Nonetheless, Defendants failed to temper their enthusiastic statements suggesting that the Phase 2 Orbit early data showed setrusumab was working to reduce fracture rates in OI patients. Defendants' baseless assertions that improved BMD does result in reduced fracture rates in patients suffering from other bone ailments primed investors to be inclined to accept Defendants' statements as true.

91. ***Second***, like the ASTEROID study, the Orbit Phase 2b study neither had enough patients nor utilized a control group and therefore could not establish or determine a causal relationship between setrusumab and lower fracture rates. The Phase 2 portion of the ORBIT study was a small, 24-patient dose-selection study designed primarily to identify the optimal dosing regimen for advancement into the pivotal Phase 3 trial, rather than to definitively evaluate fracture reduction efficacy. Patients were randomized between two setrusumab dose levels, but there was no placebo control arm. Fracture outcomes were assessed by comparing patients' fracture experience during treatment with their historical fracture rates prior to enrollment. Given its limited sample size, absence of a concurrent control group, and dose-finding objective, the Phase 2 study was not powered to establish a statistically reliable treatment effect on fracture incidence or to demonstrate that any observed reduction in fractures was attributable to setrusumab rather than natural variability, regression to the mean, or other confounding factors.

92. When researchers published the results of the ASTEROID study in a peer reviewed article, they were careful to note that the ASTEROID study was not designed to, and was not capable of, determining whether setrusumab caused a reduction in fractures.

93. Like the ASTEROID study, the Phase 2 Orbit study was not designed to, and was not capable of, determining whether setrusumab caused a reduction in fractures.

94. The Orbit Phase 2 trial protocol published on the FDA website specifically sets forth the Primary Outcome Measures and the Secondary Outcome Measures for the Orbit Phase 2 trial.

95. According to the FDA's website www.clinicaltrials.gov, the Primary Outcome Measure is defined as: "In a clinical study's protocol, the planned outcome measure that is the most important for evaluating the effect of an intervention/treatment. Most clinical studies have one primary outcome measure, but some have more than one."

96. According to the FDA's website www.clinicaltrials.gov, the Secondary Outcome Measure is defined as: "In a clinical study's protocol, a planned outcome measure that is not as important as the primary outcome measure for evaluating the effect of an intervention but is still of interest. Most clinical studies have more than one secondary outcome measure."

97. The Orbit Phase 2 trial had 1 Primary Outcome Measure: "Percent Change in Serum Amino-terminal Propeptide of Type 1 Procollagen (P1NP) from Baseline at Month 1." This was not a measure of whether setrusumab reduced bone fracture rates.

98. The Orbit Phase 2 trial had 11 different Secondary Outcome Measures. None of these concerned whether setrusumab reduced bone fracture rates.

99. Only the Orbit Phase 3 trial was designed to determine whether setrusumab reduced bone fracture rates, as was indicated in the protocol for the Orbit Phase 2/3 combined study.

100. Nonetheless, throughout the Class Period, Defendants repeatedly told investors that the Orbit Phase 2 study showed that setrusumab both increased BMD and reduced fractures. These statements, set forth in Section V, were misleading in that they were not an accurate statement of the Orbit Phase 2 data, and misled investors as to the expected results in the Orbit and Cosmic Phase 3 trials.

### G. <u>The Orbit and Cosmic Phase 3 Studies</u>

101. Prior to the Class Period, on July 6, 2023, Ultragenyx issued a press release (which Mereo adopted by filing with the SEC and posting on Mereo's website) announcing the commencement of the Orbit and Cosmic Phase 3 trials evaluating setrusumab for the treatment of OI.

102. The July 6, 2023 press release was titled: "Ultragenyx Announces First Patients Dosed in Phase 3 Program Evaluating Setrusumab (UX143) for the Treatment of Osteogenesis Imperfecta (OI)." The press release explained that the Phase 3 studies were designed to measure whether setrusumab actually prevented fractures in OI patients:

> Ultragenyx Pharmaceutical Inc. (NASDAQ: RARE) today announced that the first patients have been dosed in both of its late-stage clinical trials evaluating setrusumab in pediatric and young adult patients with OI sub-types I, III and IV. The Phase 3 portion of the pivotal Phase 2/3 Orbit study is evaluating the effect of setrusumab compared to placebo on annualized clinical fracture rate in patients aged 5 to <26 years. The newly initiated Phase 3 Cosmic study is an active-controlled study evaluating setrusumab compared to intravenous bisphosphonate (IV-BP) therapy on annualized total fracture rate in patients aged 2 to <5 years.

103. The Phase 3 portion of the Orbit study completed enrollment in April 2024 of 158 patients (aged 5 - <26 years old) at 45 sites across 11 countries. Patients were randomized 2:1 to receive setrusumab (20 mg/kg) or placebo, respectively, with a primary efficacy endpoint of a reduction in annualized clinical fracture rate, excluding fingers, toes, skull and face.

104. A second study, Cosmic, a Phase 3 open-label study in younger children (aged 2 - < 7 years old) completed enrollment in April 2024 of 66 patients at 21 sites across seven countries. The Cosmic study is an active-controlled study evaluating the effect of setrusumab compared to intravenous bisphosphonates (IV-BP) therapy (randomized 1:1) on annualized total fracture rate.

### H. Defendants Sell ADSs at Inflated Prices

105. In July 2023, shortly before the start of the Class Period and after Mereo reported the initial results of the Phase 2 Orbit study, the Company received gross proceeds of $12.0 million from the issuance of 9,673,419 ADSs through an "at-the-market" offering pursuant to its Open Market Sale Agreement with Jefferies LLC.

106. Only a few days after Mereo reported updated and misleading Phase 2 Orbit trial data on June 11, 2024, on June 14, 2024, Mereo announced the sale of 12,531,300 ADSs at a price of $3.99, for gross proceeds of approximately $50 million. The Form S-3 prospectus for the sale contained false and misleading statements regarding Orbit Phase 2 data, as detailed in Section V.

107. It wasn't just the Company that sold ADSs, the Individual Defendants and other insiders at Mereo also unloaded a substantial number of ADSs and benefitted from the artificial inflation in the Company's ADS price in the period after Defendants misleadingly described the Orbit Phase 2 data.

108. Defendant Denise Scots-Knight sold ADSs in June and September 2024. The sales were unusual since they were her first sales ever.

| Date | Sell/Buy | ADSs | Price | Proceeds | ADSs Held |
|---|---|---|---|---|---|
| 6/25/24 | Sell | 40,712 | $3.69 | $150,386 | 801,791 |
| 6/26/24 | Sell | 92,273 | $3.39 | $313,100 | 709,518 |
| 9/12/24 | Sell | 28,611 | $4.47 | $127,968 | 868,967 |
| 9/13/24 | Sell | 60,046 | $4.22 | $253,454 | 808,921 |

109. Likewise, Defendant John Lewicki sold ADSs in June and September 2024, for the first time ever.

| Date | Sell/Buy | ADSs | Price | Proceeds | ADSs Held |
|---|---|---|---|---|---|
| 6/25/24 | Sell | 7,416 | $3.69 | $27,393 | 65,587 |
| 6/26/24 | Sell | 16,808 | $3.39 | $57,033 | 48,779 |
| 9/12/24 | Sell | 5,212 | $4.47 | $23,312 | 89,567 |
| 9/13/24 | Sell | 10,937 | $4.22 | $46,165 | 78,630 |

### I. The Phase 3 Results and Mereo's ADS Price Collapse

110. On July 9, 2025, Ultragenyx and Mereo issued a press release titled: "Ultragenyx and Mereo BioPharma Announce UX143 Phase 3 Orbit Study for Osteogenesis Imperfecta Progressing to Final Analysis." The press release informed investors that the Phase 3 Orbit study interim data did ***not*** demonstrate (in a statistically significant manner) that setrusumab reduced fracture rates in patients suffering from OI. In pertinent part, Defendants announced the Phase 3 Orbit and Cosmic studies would now be "progressing toward final analysis."

111. Investors and analysts reacted immediately to Mereo's revelation. The price of Mereo's ADS declined dramatically. From a closing market price of $2.94 per ADS on July 9, 2025, Mereo's ADS price fell to $1.69 per ADS on July 10, 2025, a decline of about 42.52% in the span of just a single day.

112. Despite failing to meet the second interim analysis' statistically significant target, analysts and investors continued to be misled by Defendants' false and misleading statements that setrusumab increased BMD and thus reduced fractures in OI patients. For instance, on July 9, 2025, BTIG analysts Julian Harrison and Reit Tan issued an analyst report stating that they still believed setrusumab would reach its Phase 3 primary endpoints and be proven to reduce fracture rates in OI patients. The BTIG analyst report parroted Defendants' false and misleading statements as the rationale for his belief.

> Despite IA2 not meeting the prespecified threshold for disclosure, we still expect positive disclosure from the Phase 3 portion of Orbit upon final analysis based on the 6mo longer minimum follow-up (18mo vs. 12mo) and higher alpha spend for statistical significance (p<.04 vs. p<.01).
>
> * * *
>
> BMD Z-score improvements from anti-sclerostin blockage should translate to clinical fracture benefit. We believe the 14mo. data demonstrating significant reduction in fracture rate seen in the Phase 2 portion of Orbit significantly derisks the Phase 3 data readout. In addition to the expected translation of Phase 2 data, multiple studies have demonstrated associations of BMD Z-score and reduced fracture rate.

113. Similarly, Needham issued an analyst report on July 10, 2025 reporting Mereo ADSs were down on the news of missing the second interim analysis, but that the analyst was confident that setrusumab increased BMD and that would translate to a decreased fracture rate.

> Mereo and Ultragenyx (RARE, NR) announced that the Phase III Orbit study will continue towards a final analysis expected in 4Q:25 after missing on its second interim. This outcome represents our downside scenario [ ], as such, we expect MREO to be under pressure today. However, ***our overall view on setrusumab's ultimate likelihood of success remains unchanged***, given ~80% alpha spend is reserved for the final analysis. ***Our confidence is supported by the established relationship between increases in BMD and reduction (over time) in fracture rates. Thus, we maintain our Buy Rating***

114. On December 29, 2025, Mereo issued a press release announcing that neither the ORBIT nor the COSMIC Phase 3 studies achieved statistical significance. The press release indicated that neither study met its primary endpoint of reduction in annualized clinical fracture rate compared to placebo or bisphosphonates, respectively, despite improved bone mineral density.

115. The price of Mereo's ADS declined dramatically. From a closing market price of $2.31 per ADS on December 26, 2025, Mereo's ADS price fell to $0.29 per ADS on December 29, 2025, a decline of more than 87.7%.

116. On January 2, 2026, BioPharm International published an article by Feliza Mirasol titled "Ultragenyx Phase III Data Reveal Limits of Bone Density Endpoints in Rare Bone Disease."

The article reported on the Ultragenyx and Mereo press release, highlighting the industry debate as to whether bone mineral density can be relied upon as a proxy for fracture rates.

> US-based Ultragenyx Pharmaceutical reported Phase III data from two late-stage studies evaluating setrusumab, a fully human monoclonal antibody (mAb), in osteogenesis imperfecta (OI), a rare genetic disorder marked by fragile bones and recurrent fractures. While both trials demonstrated statistically significant improvements in bone mineral density (BMD), neither met its primary endpoint of reducing annualized clinical fracture rates compared with standard comparators (1). ***These data underscore the persistent challenges in translating surrogate bone metrics into clinical benefit*** (2).
>
> * * *
>
> ***The divergence between BMD improvements and fracture outcomes raises questions relevant to the broader biopharmaceutical industry. Regulators and developers continue to debate whether bone density can serve as a reliable surrogate endpoint in rare skeletal disorders, particularly when fracture events are infrequent or variable over time***. (6).
>
> *citations omitted

117. Despite the evidence indicating that increased BMD in OI patients did not translate to real tangible reductions in fracture rates, Defendants throughout the Class Period misled investors by repeatedly asserting that setrusumab significantly increased BMD and this caused a real reduction in test subjects OI symptoms, including fracture rates.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

118. During the Class Period, Defendants repeatedly and misleadingly told investors that setrusumab caused OI patients to grow more bone and increase bone mineral density (BMD), and that this increase in BMD was a good measure of bone health and strength. What Defendants knew, but failed to disclose, was that while BMD is ordinarily a good measure of bone health in most people, the scientific literature had ***not*** found a correlation between BMD and bone health/strength in patients suffering from OI. Going back to the analogy of bone as akin to steel-reinforced concrete, BMD tells us about the cement but it doesn't address the fundamental problem faced by

patients with OI – defective collagen, which acts as the rebar to strengthen the cement.

119. In addition, Defendants repeatedly and misleadingly told investors that the Phase 2 Orbit data showed that setrusumab caused OI patients to incur fewer bone fractures even though the Phase 2 portion of the Orbit study was neither intended to answer that question, nor was it sufficiently designed with enough patient participants or a control group to properly answer that question. Under FDA regulations and ICH E9, the protocol defines the scientific question a clinical trial is designed to answer. The protocol identifies the study objectives, estimands, endpoints, statistical analyses, sample size, and controls necessary to answer that question reliably. Accordingly, a sponsor cannot accurately represent that a clinical trial demonstrated a treatment effect that the protocol was not designed, powered, or controlled to establish.

120. On October 14, 2023, Ultragenyx and Mereo published a press release (subsequently filed with the SEC by Mereo) titled "Ultragenyx and Mereo BioPharma Announce Interim Phase 2 Data from Phase 2/3 Orbit Study Demonstrating Setrusumab (UX143) ***Significantly Reduced Fracture Rates*** in Patients with Osteogenesis Imperfecta (OI)" and subtitled "Phase 2 data presented at ASBMR 2023 show treatment with setrusumab ***resulted in 67% reduction in annualized fracture rate associated with continuous and meaningful improvements in bone mineral density (BMD)***." The press release stated:

> Ultragenyx Pharmaceutical Inc. (NASDAQ: RARE) and Mereo BioPharma Group plc (NASDAQ: MREO) today announced interim data from the Phase 2 portion of the Phase 2/3 Orbit study demonstrating that treatment with setrusumab (UX143) ***significantly reduced incidence of fractures*** in patients with OI with at least 6 months of follow-up and continues to demonstrate ongoing and meaningful improvements in lumbar spine bone mineral density (BMD). The data were presented in a late-breaker presentation at the American Society for Bone and Mineral Research 2023 Annual Meeting (ASBMR).
>
> As of the cut-off date and following at least 6 months of treatment with setrusumab, the annualized fracture rate across all 24 patients in the Phase 2 portion of the study was reduced by 67%.

***

***The reduction in annualized fracture rates was associated with a clinically meaningful increase in BMD***. At the 6-month timepoint, treatment with setrusumab resulted in a mean increase in lumbar spine BMD from baseline of 13% at 20 mg/kg (n=11) and 16% at 40 mg/kg (n=8), which represents the same substantial mean improvement in Z-score of +0.85 for both dose groups at 6 months compared to a combined mean baseline Z-score of –1.68. . . .

"***These data provide compelling evidence that improved bone mineral density, resulting from this unique mechanism of action, reduced the risk of fractures and that treatment with setrusumab could allow patients with OI to lead much more active lives with fewer fractures***," said Eric Crombez, M.D., chief medical officer at Ultragenyx.

121. Defendants' October 14, 2023 press release misled investors by drawing conclusions unsupported by the study that setrusumab "significantly reduced incidence of fractures in patients with OI." As set forth in Sections IV.E. and IV.F., under FDA regulations and ICH E9, the protocol defines the scientific question a clinical trial is designed to answer. Defendants falsely claimed in this press release a causal link had been established. However, the Phase 2 Orbit trial was not designed to establish a causal link between setrusumab and fractures. The Phase 2 Orbit trial data covered only 24 patients and did not include a control/placebo group. The study simply wasn't powered to reach the conclusions Defendants disseminated in the October 14, 2023 press release. It was not statistically, scientifically, or factually accurate to say: "These data provide compelling evidence that improved bone mineral density, resulting from this unique mechanism of action, reduced the risk of fractures. . . ."

122. On January 8, 2024, Mereo issued a press release titled: "Mereo BioPharma Provides Update on Pipeline Progress and Corporate Developments." Significantly, Defendants again misleadingly described the results of the Orbit Phase 2 study.

Recent data reported in October 2023, from the 24 patients enrolled in the Phase 2 portion of the Orbit study with at least 6 months of treatment, ***showed that treatment with setrusumab reduced the annualized fracture rate by 67%.*** This

reduction was associated with continuing ***large and meaningful improvements in bone mineral density*** (BMD).

123. The Phase 2 portion of the Orbit study was neither designed nor sufficiently powered to show that "setrusumab reduced the annualized fracture rate" as the number of participants was too small and the Phase 2 portion of the study did not include a control group, and therefore could not establish the conclusions stated.

124. On March 12, 2024, Mereo CEO Denise Scots-Knight and CFO Christine Fox spoke at the Leerink Partners Global Biopharma Conference. Defendant Scots-Knight answered questions from the host, misleadingly characterizing the fracture reduction rate of setrusumab in the Phase 2 trials:

> Q - Joseph Schwartz
> So can you start us off by giving us an overview of the company's programs and recent progress? And then we'll talk about each of them in more detail.
>
> A - Denise Scots-Knight
> Okay. So we started 2024 in a really good place with both of our late-stage rare disease
> programs, both significant market opportunity, with highly-differentiated potential products. So first of all, setrusumab, following on from the Phase 2 data, ***very impressive reductions in fracture in the Orbit Phase 2 study, that we and our partner, Ultragenyx, reported out.***

125. In follow-up questioning, Defendant Scots-Knight again misleadingly asserted that setrusumab caused a dramatic decrease in fracture rates for OI patients.

> Q - Joseph Schwartz
> Yes. It's great to see the company maturing at this point. So can we start with setrusumab and have you talk a bit about that approach and what that could do for patients and what it has been doing for patients now that you have some pretty intriguing Phase 2 data?
>
> A - Denise Scots-Knight
> Sure. So ***the Phase 2 data showed a 67% reduction in fractures compared to historical fracture rates***. And in fact, two of the patients who did have a fracture, that was in the first two months of treatment before we'd expect the setrusumab

> effect to kick in***, so these were <u>really dramatic reductions</u> in fracture, really impressive reductions in fracture***.
>
> And with the six months data point, the other key thing here, we all look at percent changes in BMD, which is important, but I think more important are the Z-scores, because those are more absolute measurements. So looking at the changes in the Z-scores of these patients where they start with a Z-score, which is 2 -- sometimes 4 points below a normal individual for the same matched age and gender, to see these beginning to normalize, changes of plus 1 in those Zscores are really impressive. ***And the more the Z-score approaches a normal score, the more you would expect a reduction in fractures. So really impressive data***.

126. As Defendants knew, the Phase 2 portion of the Orbit study was not sufficiently powered and did not include a placebo or other concurrent control group for the purposes of assessing whether setrusumab reduced fractures, and therefore it was misleading for Mereo's CEO to assert that the data "showed a 67% reduction in fractures."

127. On March 27, 2024, Mereo issued a press release titled: "Mereo BioPharma Reports Full Year 2023 Financial Results and Provides Corporate Update," repeating the false claim that the Phase 2 Orbit study showed setrusumab reduced fractures. "In October 2023, data from the Phase 2 portion of ***the Phase 2/3 Orbit study showed that setrusumab treatment reduced the annualized fracture rate by 67% in patients with OI*** who had been treated for at least 6 months. ***This reduction was associated with improvements in bone mineral density (BMD)***."

128. The March 27, 2024 press release was misleading because, as detailed herein, the Phase 2 portion of the Orbit study was not capable of showing setrusumab caused the reduction in fractures, and linking that reduction in fractures to improvement in BMD was also not supported by the data or the scientific literature.

129. In the Company's 2023 Form 10-K published with the SEC on March 27, 2024, Defendants again referenced the results of the Orbit Phase 2 trial as establishing that setrusumab both increased BMD ***and*** reduced fracture rates in patients with OI. The Form 10-K stated:

In June 2023, we along with our partner, Ultragenyx, announced successful completion of the Phase 2 portion of the pivotal Phase 2/3 Orbit study in 24 pediatric and young adult patients (5 to <26 years old) for setrusumab in OI, which compared two different doses of setrusumab, 20 and 40 mg/kg, to determine the optimal dose for the Phase 3. The primary endpoint of the Phase 2 study was circulating levels of P1NP, a biomarker reflective of bone formation. ***The study also evaluated numerous other endpoints, including bone mineral density ("BMD") and annualized fracture rates***, PK and safety. Across all patients evaluated at both doses, these data showed statistically significant increases in levels of serum P1NP, a sensitive marker of bone formation, ***and substantial and significant improvement in BMD by three months***. An increase in lumbar spine BMD from baseline of 9.4% at 20 mg/kg (n=10) was observed, with a substantial mean change in the Z-score of +0.65 from -2.12 (n=11) at baseline. There was no significant difference between the two doses tested, accordingly, the 20 mg/kg was selected as the Phase 3 dose. The changes observed in BMD in these younger patients at 3 months are equivalent to the changes following 12 months treatment with setrusumab in adult patients reported from the Phase 2b ASTEROID study. The 24 patients from the Phase 2 portion of the ORBIT study are continuing to receive setrusumab treatment in an open-label extension study.

Additional data from the Phase 2 portion of the Phase 2/3 Orbit study were reported at the annual ASBMR meeting in October 2023 ***and demonstrated that treatment with setrusumab significantly reduced incidence of fractures in patients with OI with at least 6 months of follow-up and continued to demonstrate ongoing and meaningful improvements in lumbar spine bone BMD.*** As of the cut-off date and following at least six months of treatment with setrusumab, ***the annualized fracture rate across all 24 patients in the Phase 2 portion of the study was reduced by 67%.*** The median annualized fracture rate of 0.72 in the two years prior to treatment was reduced to 0.00 (n=24, p=0.042) during the mean treatment duration period of nine months. These fractures excluded fractures of the fingers, toes, skull and face consistent with the Phase 3 study design. In the two years prior to treatment with setrusumab all patients experienced at least one fracture. Following initiation of treatment with setrusumab, 20 patients experienced no radiographic-confirmed fractures, and 4 patients experienced 7 radiographic-confirmed fractures in 5 separate events. Two of these fractures occurred within the first two months of treatment, a time in which setrusumab-induced increases in BMD may have been suboptimal in reducing fractures.

At the six-month timepoint, treatment with setrusumab resulted in a mean increase in lumbar spine BMD from baseline of 13% at 20 mg/kg (n=11) and 16% at 40 mg/kg (n=8), which represented the same substantial mean improvement in Z-score of +0.85 for both dose groups at 6 months compared to a combined mean baseline Z-score of –1.68. The small apparent difference in BMD change from baseline is likely related to differences in patients assigned to the two treated groups. There was no statistically significant difference in BMD percent change or Z-score change from baseline between the 20 and 40 mg/kg dosing cohorts. As of

> the data cut-off for our October 2023 announcement, there were no treatment-related serious adverse events observed in the study.

130. These statements were misleading. It was not accurate to say: "The study also evaluated numerous other endpoints, including bone mineral density ("BMD") and annualized fracture rates. . . ." Annualized fracture rate was NOT an endpoint in the Orbit Phase 2 trial. Furthermore, like the ASTEROID study, the Orbit Phase 2b study neither had enough patients nor utilized a control group and therefore could not establish or determine a causal relationship between setrusumab and lower fracture rates. It was also misleading for Defendants to continue to assert that increased BMD was associated with clinical improvements in OI patients or reduced fracture rates in OI patients, which has not been established in OI patients though it has been established in patients suffering other bone ailments. Defendants' contention that the reduction in fracture rates was statistically significant, misleadingly suggested that the results were scientifically rigorous when in fact the Phase 2 Orbit trial did not comport with basic requirements to demonstrate efficacy.

131. On April 9, 2024, Mereo CEO Denise Scots-Knight and Chief Scientific Officer John Lewicki spoke at the 23rd Annual Needham Virtual Healthcare Conference. In her presentation, Defendant Scots-Knight misleadingly asserted that Mereo's Phase 2 data showed setrusumab reduced fracture rates.

> Yeah. Thanks, Gil, and thanks for hosting us here today. So we've made tremendous progress over the last seven months and it really started with the Orbit Phase 2 for setrusumab in osteogenesis imperfecta, which was reported out in October by ourselves and our partner Ultragenyx, and ***this trial showed for the first time that setrusumab could reduce the fracture rate***, the annualized fracture rate in young children and young adults by 67% and this was really -- I think this data answered a lot of questions.
>
> This was after only six months treatment and ***it answered a lot of questions*** because we've had a lot of discussion around how setrusumab, which increases BMD, we've shown that in a lot of [statistics] in Phase 2 of a study in adults, and ***how that BMD***

> ***change would actually translate into reduction in fractures in osteogenesis imperfecta***. It's been seen, everybody believes that happens in osteoporosis, ***but would that translate in OI***? ***<u>And indeed it did, so that really derisked the program, derisked the ongoing Phase 3 study</u>***.

132. The Orbit Phase 2 data did not "derisk" the ongoing Phase 3 study, nor did the Orbit Phase 2 data show that increases in BMD would "translate into reduction in fractures in osteogenesis imperfecta" as Defendant Scots-Knight asserted, because Orbit Phase 2 was not capable of reaching any such conclusions and was not intended to do so. As detailed in Section IV.E., Orbit Phase 2 lacked both the sample size and study design necessary with a concurrent control group to reach the conclusions Defendants told investors. Fracture rate was not even a primary or secondary outcome in the Orbit Phase 2 trial protocol, and the trial was not designed to test whether setrusumab reduced fractures in OI patients.

133. On April 30, 2024, Ultragenyx issued a press release that Mereo adopted by publishing it on the Mereo website and by Mereo filing it with the SEC. The press release announced the completion of enrollment in the Phase 3 Orbit and Cosmic trials and quoted Ultragenyx Chief Medical Officer stating:

> "The interim Phase 2 Orbit study results ***show a rapid and clinically meaningful decrease in fracture rate, giving us confidence in our ability to bring this potential new treatment to patients living with OI***. Our goal is to provide patients and their families a novel treatment that can significantly reduce the burden of fractures and improve their quality of life by building new and stronger bone."

134. The April 30, 2024 press release further stated:

> Data presented at the American Society for Bone and Mineral Research 2023 Annual Meeting (ASBMR) from the Phase 2 portion of the Orbit ***study showed that treatment with setrusumab reduced the median annualized fracture rate by 67% and this reduction was associated with continuing large and meaningful improvements in bone mineral density*** (BMD).

135. The Phase 2 Orbit study did not "show" that setrusumab reduced fracture rates, as it was not capable of "showing" such a thing. The number of participants and the lack of a control

group made it improper for Defendants to draw these conclusions from the data and represent them as scientifically rigorous to investors, as detailed in Section IV.E. Defendants' assertion that the Phase 2 Orbit study results "show a rapid and clinically meaningful decrease in fracture rate" misrepresented what the Orbit Phase 2 study had actually demonstrated, as the protocol for Orbit Phase 2 did not even include fracture rate as a primary or secondary outcome in the study, and therefore the trial was not designed to reach any such conclusion.

136. On June 11, 2024, Ultragenyx and Mereo released a press report titled: "Ultragenyx and Mereo BioPharma Announce New Phase 2 Data from Phase 2/3 Orbit Study Demonstrating Sustained Reductions in Fracture Rates Following Treatment with Setrusumab (UX143) in Patients with Osteogenesis Imperfecta (OI)." The press release contained the subtitle: "14-month data ***show treatment with setrusumab resulted in a large, sustained 67% reduction in annualized fracture rate*** and persistent median annualized fracture rate of 0.00 (p=0.0014)." The press release continued:

> Ultragenyx Pharmaceutical Inc. (NASDAQ: RARE) and Mereo BioPharma Group plc (NASDAQ: MREO) today announced positive 14-month results from the Phase 2 portion of the ongoing Phase 2/3 Orbit study (NCT05125809) ***demonstrating that***, as of a May 24, 2024 data cut-off date, ***treatment with setrusumab (UX143) continued to significantly reduce incidence of fractures in patients with OI*** with at least 14 months of follow-up. Treatment with setrusumab also resulted in ongoing and meaningful improvements in lumbar spine bone mineral density (BMD) at month 12 without evidence of plateau.
>
> The large reduction in annualized radiologically ***confirmed fracture rate previously reported in patients treated for a minimum of 6 months was sustained in patients treated for at least 14 months <u>with a high degree of significance</u>***.
>
> * * *
>
> "***The clinically meaningful continued improvement in BMD suggests that new and stronger bone is being created that has <u>resulted</u> in an important reduction in fractures across age groups and types of OI***," said Eric Crombez, M.D., chief medical officer at Ultragenyx. "With our phase 3 Orbit and Cosmic studies fully

enrolled we now look forward to the possibility to bring this potential new treatment to a larger number of patients living with OI."

137. Defendants' June 11, 2024 press release misled investors by drawing conclusions unsupported by the study that setrusumab "continued to significantly reduce incidence of fractures in patients with OI." Defendants falsely claimed in this press release a causal link had been established "with a high degree of significance." The interim Phase 2 Orbit data covered only 24 patients and did not include a control/placebo group. The study simply wasn't designed or powered to reach the conclusions Defendants disseminated in the June 11, 2024 press release. Furthermore, Defendants again asserted that increased BMD was indicative of stronger bone that resulted in lower fracture rates, when the Orbit Phase 2 study was not powered to determine this causal relationship and the causal relationship is not established in the scientific literature. By claiming that the Phase 2 Orbit data caused a reduction of bone fracture "with a high degree of significance," Defendants misleadingly asserted a scientific certainty that did not in fact comport with scientific requirements for claiming such a result.

138. On June 14, 2024, Mereo announced it would sell 12,531,300 ADSs to the public at a price of $3.99 per ADS. In connection with the sale of these ADSs, Mereo filed a Form S-3 prospectus supplement with the SEC. The Form S-3 incorporated by reference the false and misleading press releases issued on April 15, 2024, May 23, 2024, and June 11, 2024, as well as the Company's Form 10K filed on March 27, 2024. The Form S-3 prospectus supplement also made the following false and misleading statement:

> On June 11, 2024 we and Ultragenyx Pharmaceutical Inc. (NASDAQ: RARE) announced positive 14-month results from the Phase 2 portion of the ongoing Phase 2/3 Orbit study (NCT05125809) ***demonstrating that, as of a May 24, 2024 data cut-off date, treatment with setrusumab (UX143) continued to significantly reduce incidence of fractures in patients with OI*** with at least 14 months of follow-up. Treatment with setrusumab ***also resulted in ongoing and meaningful***

> ***improvements in lumbar spine bone mineral density (BMD)*** at month 12 without evidence of plateau.
>
> The large reduction in annualized radiologically confirmed fracture rate previously reported in patients treated for a minimum of 6 months was sustained in patients treated for at least 14 months with a high degree of significance. The median annualized rate of radiologically confirmed fractures across all 24 patients in the 2 years prior to treatment was 0.72. Following a mean treatment duration period of 16 months, the median annualized fracture rate was reduced 67% to 0.00 (p=0.0014; n=24). The annualized fracture rate excluded morphometric vertebral fractures and fractures of the fingers, toes, skull, and face, consistent with the Phase 3 study primary efficacy endpoint.
>
> ***The reduction in annualized fracture rates was associated with continued, clinically meaningful increases in BMD.***

139. The June 14, 2024 prospectus misled investors by drawing conclusions unsupported by the Orbit Phase 2 study, claiming the Orbit Phase 2 data "demonstrate[ed] that . . . setrusumab (UX143) continued to significantly reduce incidence of fractures in patients with OI." Defendants falsely claimed in the June 14, 2024 prospectus a causal link had been established. The interim Phase 2 Orbit data covered only 24 patients and did not include a control placebo group. The study simply was neither designed, controlled, nor powered to reach the conclusions Defendants disseminated in prospectus. Furthermore, Defendants again asserted that increased BMD was associated with lower fracture rates, when the Orbit Phase 2 study was not powered to determine this causal relationship and the causal relationship is not established in the scientific literature.

140. The June 14, 2024 secondary offering was underwritten by Jefferies, Leerink Partners, and Cantor, who earned substantial fees for their services, and thus gave Jefferies, Leerink Partners, and Cantor an incentive to not challenge Defendants' misleading statements during analyst conferences and in analyst reports about the Company.

141. On July 3, 2024, Defendant Scots-Knight spoke to Biotech TV in an interview published on Mereo's website and on BiotechTV's website. Defendant Scots-Knight acknowledged that the Company's $50 million financing in June had been enabled by the reported interim data, which Defendant Scots-Knight misleadingly assured investors had "derisked" the Phase 3 trial:

> You mentioned the financing at the beginning. We have the October data. We have the June data. ***I think for all of us, those data really derisked Phase 3. That fracture endpoint is the phase 3 endpoint. And so it was a real derisking event***. There's two phase 3s that are ongoing. Orbit is the major driver for approval. That has enrolled 158 patients and its comparing setrusamab to placebo with an endpoint of annualized fracture rate excluding skull, fingers, toes, and face, which it what the FDA wanted. And, so we have a study that fully enrolled around the end of April and we have the first interim analysis around the end of the year.
>
> https://www.biotechtv.com/post/mereo-biopharma-july-3-2024 (reviewed 6/17/2026)

142. Defendant Scots-Knight's statements were misleading. The Phase 2 Orbit data was not a "real derisking event" because the Phase 2 Orbit study was not powered sufficiently to make any determinations of cause-and-effect resulting from taking setrusumab and reduced fractures (the endpoint in the Phase 3 Orbit trial).

143. On August 13, 2024, Mereo issued a press release titled "Mereo BioPharma Reports Second Quarter 2024 Financial Results and Provides Corporate Update." The press release quoted Defendant Scots-Knight:

> "We continued to make significant progress this quarter highlighted by additional positive data from the Phase 2 portion of the ongoing Phase 2/3 Orbit study in patients with OI," said Dr. Denise Scots-Knight, Chief Executive Officer of Mereo. "These data showed that the statistically significant annualized fracture rate reduction of 67% was maintained following treatment with setrusumab for at least 14 months of follow-up, further demonstrating the potential of setrusumab to generate long-term, clinically meaningful benefit for people living with OI.["]

144. The press release also misleadingly asserted that setrusumab had been shown to reduce fracture rates and increase BMD, without disclosing the limitations of the Orbit Phase 2

study to reach such a conclusion:

> The results from the Phase 2 portion of the Orbit study demonstrated that, as of the May 24, 2024 data cut-off date, treatment with ***setrusumab continued to significantly reduce incidence of fractures*** in patients with OI. Treatment with setrusumab also resulted in ***ongoing and meaningful improvements in lumbar spine bone mineral density*** (BMD) at month 12 without evidence of plateau.

145. These statements were false and misleading as the Phase 2 portion of the Orbit study was not designed, powered, or controlled to scientifically demonstrate that setrusumab reduced fracture rates in patients with OI. *See* § IV.F.

146. On September 18, 2024, Mereo CEO Denise Scots-Knight spoke at the Cantor Fitzgerald Global Healthcare Conference. Defendant Scots-Knight misleadingly assured investors that setrusumab reduced fractures in OI patients:

> We're happy to be one of your top stock picks, by the way. So, in terms of the OI program. So, osteogenesis imperfecta, we are looking to this is genetic disease. Brittle bone is what it's commonly known as, and prevalence of around 60,000 EU U.S. I know we'll come onto the numbers a little bit more.
>
> So, we're looking to treat the fracture in particular of these children and adults with setrusumab, our anti-sclerostin inhibitor, which has both anabolic, so bone building as well as prevention of bone resorption. Bone is a dynamic structure, if you will.
>
> And so why the increase in confidence in the program now? I mean, ***I think over the course of the last 12 months, we've gone from, is setrusumab really going to reduce fractures to when are we going to get the data because this is going to work***?
>
> And the reason for that is because there's been a Phase 2 study ongoing with 24 patients age 5 to 26. And the first readout, which came just a month after this meeting last year, in October last year, showed a 67% reduction in fractures. ***And importantly, that 67% reduction in fractures was the same endpoint as being used in the Phase 3 study. So, that excludes fingers, toes, face and skull, which the FDA has requested. And that was statistically significant. It was 0.042, I think.***
>
> And also the BMD changes in the patients were very large BMD changes of 14% as a median, and very importantly, really good changes in the Z-score.

* * *

> So, the signal, as a result of more events, has got stronger with time. So, ***really increasing the confidence that setrusumab reduces fractures and indeed that the Phase 3 studies have got a very good chance of success***. So, that is what underpins, I think, the confidence in the program and our valuation.

147. Defendant Scots-Knight's comments were misleading in that the Phase 2 Orbit trial wasn't sufficiently powered or designed to support the conclusions she was publicly touting, that setrusumab reduced fractures, without tempering those statements with adequate disclosures that the Phase 2 Orbit trial was a small study without a control group, such that any enthusiasm for the Phase 2 Orbit data required confirmation in the properly designed Phase 3 trials. Further, Defendant Scots-Knight's assertion that the reduction in fracture rates was statistically significant suggested that Ultragenyx and Mereo had followed proper scientific protocol in reaching this conclusion – when in fact the Phase 2 Orbit trial protocol did not even include fracture rate as a primary or secondary outcome to be measured.

148. On October 7, 2024, Ultragenyx issued a press release titled: "Ultragenyx Receives Breakthrough Therapy Designation for Setrusumab (UX143) in Osteogenesis Imperfecta." Mereo adopted the press release by posting it on Mereo's website and filing it with the SEC. The press release misleadingly asserted that the FDA had concurred that setrusumab caused a decline in fracture rates:

> The FDA's decision is based on preliminary clinical evidence including the positive 14-month results from the Phase 2 portion of the Orbit study, ***which demonstrated a rapid and clinically meaningful decrease in fracture rate in patients***, and from the completed Phase 2b ASTEROID study.

149. The Phase 2 portion of the Orbit study had not been designed to assess whether a "rapid and clinically meaningful decrease in fracture rate in patients" with OI had in fact occurred as a result of taking setrusumab, as Orbit Phase 2 was not sufficiently powered or designed with a control group to reach any such conclusion.

150. On November 12, 2024, Mereo reported third quarter 2024 financial results and misleadingly implied that FDA had agreed with Mereo's assertion that the Phase 2 Orbit trial "demonstrated a rapid and clinically meaningful decrease in fracture rates."

> Our partner, Ultragenyx Pharmaceutical Inc., received Breakthrough Therapy Designation from the U.S. Food and Drug Administration (FDA) for setrusumab (UX143) as a treatment to reduce the risk of fracture associated with osteogenesis imperfecta (OI) Type I, III, or IV in patients 2 years of age and older.
>
> The ***FDA's decision was based on preliminary clinical evidence including the positive 14-month results from the Phase 2 portion of the Orbit study, which demonstrated a rapid and clinically meaningful decrease in fracture rate in patients, and from the completed Phase 2b ASTEROID study.***

151. The Phase 2 portion of the Orbit study had not demonstrated a rapid and clinically meaningful decrease in fracture rate in patients with OI, as it was not sufficiently powered or designed to reach any such conclusion.

152. On January 16, 2025, Mereo CEO Denise Scots-Knight and Chief Scientific Officer John Lewicki spoke at the J.P. Morgan Healthcare Conference. In her presentation, Defendant Scots-Knight misleadingly asserted that Mereo's Phase 2 data showed setrusumab led to increases in bone mineral density ("BMD") and that reduced fractures in patients

> And what you can see here are the BMD changes in these 5 to 25-year olds out to 12 months. And it's ***really, really impressive changes in BMD***, the 22%, the mean, but if you go down and you see at the bottom, in the 5 to 12-year olds, it was actually almost 30% change in BMD. It's really striking data. And importantly, the Z-score, which compares your BMD to an age and gender matched individual, we're starting to normalize the Z-scores in these OI patients.
>
> And that was irrespective of whether you're a Type 1, Type 3, or Type 4. ***And we're often asked, how does BMD translate into fracture reduction? So here we are in this phase, same Phase 2 study, we saw a medium 67% reduction in annualized fracture rate in this group of patients posttreatment compared to pre-treatment***.

153. Mereo's Chief Scientific Officer John Lewicki responded to a question about meeting the various interim readouts for the Phase 3 trials, falsely telling investors that setrusumab

stopped fractures and misleadingly assuring investors the Company was very positive setrusumab would meet the fracture endpoints either at the second interim analysis of the data (IA2) or at the final readout of the data. He stated:

> We're much more enthusiastic, as Denise highlighted, about IA2. That's going to take place roughly mid-year. Instead of 2% of the alpha spend, we're using 20%. So it requires a P-value of less than 0.01, and it gives additional months -- a significant number of additional months for more events to occur. So, statistically, that has a -- what we believe, is a really good chance of hitting. ***I mean, Denise showed the data from the Phase 2s. <u>The reality is once patients are treated with setrusumab, fractures become very infrequent.</u>*** So we think IA2 is set up to be successful. Should we have to go to a final analysis, that would take place late in '25. We still retain 78% of the alpha spend, so a P of less than 0.039. Obviously, at that point, you'd have more events accumulating, but we're pretty confident that we have a great shot with IA2

154. Again, Defendants were telling investors that the trial showed efficacy that the data could not support. The Orbit Phase 2 study was not designed to, and could not, demonstrate that increased BMD resulted in decreased fracture rates. Nor could the Orbit Phase 2 study establish "[t]he reality is once patients are treated with setrusumab, fractures become very infrequent."

155. On March 26, 2025, Mereo published its 2024 Form 10-K, filing it with the SEC and posting it to the Company website. The 2024 Form 10-K was signed by Defendant Scots-Knight. Defendants once again misleadingly told investors that Orbit Phase 2 had "demonstrated that setrusumab significantly reduced incidence of fractures".

> Additional data from the Phase 2 portion of the Phase 2/3 Orbit study were reported at the annual ASBMR meeting in October 2023 ***and demonstrated that treatment with setrusumab significantly reduced incidence of fractures in patients with OI*** with at least six months of follow-up and continued to demonstrate ongoing and meaningful improvements in lumbar spine bone BMD. As of the cut-off date and following at least six months of treatment with setrusumab, the annualized fracture rate across all 24 patients in the Phase 2 portion of the study was reduced by 67%.

156. The 2024 Form 10-K was false and misleading because the Orbit Phase 2 study was not capable of demonstrating such a cause-and-effect relationship. Defendants' statements misled

investors as to the efficacy of setrusumab. The protocol did not permit that conclusion.

157. On June 4, 2025, Defendants Scots-Knight and Lewicki both spoke at the Jefferies Global Healthcare Conference. When asked about why Mereo reported the median, and not the mean, annual fracture rate ("AFR") reduction for the Orbit Phase 2 data, Defendant Lewicki answered.

> Q – Maury Racroft – [W]hat you said is consistent with what Ultragenyx has said to[o], where I think median and mean were pretty close.
>
> A – John Lewicki – They're pretty close. The range – so the median was 0.72. The range of AFR in those type – in the Phase 2 patients actually ranged up to 3.5. There was quite a range. But implicit in that is that the mean indeed was higher than the median.
>
> Q – Maury Raycroft – Got it. Okay. And . . . .
>
> A – John Lewicki – ***But the key thing is patients stop fracturing.***

158. Defendant Lewicki's statement that "the key thing" about the Orbit Phase 2 trial is that it showed "patients stop fracturing" when they take setrusumab was false and misleading. As Defendants knew, the Orbit Phase 2 trial was not sufficiently powered to demonstrate whether setrusumab stopped patients from fracturing.

159. On July 9, 2025, Ultragenyx and Mereo issued a press release titled: "Ultragenyx and Mereo BioPharma Announce UX143 Phase 3 Orbit Study for Osteogenesis Imperfecta Progressing to Final Analysis." The press release was also posted to Mereo's website. The press release informed investors that the Phase 3 Orbit study interim data ***failed*** to show a statistically significant reduction in fracture rates. In pertinent part, Defendants announced the Phase 3 Orbit and Cosmic studies would now be "progressing toward final analysis." The press release quoted the CEO of Ultragenyx stating:

> "Based on the feedback we hear from investigators and families who participated in the studies, ***we are confident that increasing bone mass leads to stronger bone,***

> ***less fractures, and improved physical abilities***," said Emil D. Kakkis, M.D., Ph.D., chief executive officer and president of Ultragenyx. "While we had hoped to be able to stop the study early, we look forward to having results from both Orbit and Cosmic around the end of this year."

160. The statements in Mereo's press release were misleading. Defendants had throughout the Class Period misrepresented both (i) that setrusumab increased BMD and this resulted in healthier and stronger bone, which would decrease fracture rates, and (ii) that the Orbit Phase 2 data demonstrated setrusumab reduced fracture rates. These statements were misleading. In this context, it was also misleading for Defendants to assert "we are confident that increasing bone mass leads to stronger bone, less fractures, and improved physical abilities" – especially when the Phase 3 data did not support that conclusion.

## VI. LOSS CAUSATION

161. Defendants, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. During the Class Period, Defendants engaged in a scheme and wrongful course of business conduct that was designed to inflate the Company's ADS price by misleading investors as to likelihood that setrusumab would be shown to reduce fracture rates in patients suffering from OI. Mereo's ADSs traded at artificially inflated prices as a direct result of Defendants' materially false and misleading statements, and concealment of the relevant truth about Defendants' fraudulent scheme. Plaintiffs and other Class members purchased Mereo's ADSs at artificially inflated prices and suffered damages when Mereo's ADS price declined as the relevant truth entered the market.

162. Investors began to question the veracity of Defendants' public statements on July 9, 2025, following Ultragenyx and Mereo issuing a press release titled: "Ultragenyx and Mereo BioPharma Announce UX143 Phase 3 Orbit Study for Osteogenesis Imperfecta Progressing to Final Analysis." The press release informed investors that the Phase 3 Orbit study failed to achieve

statistical significance for the second interim analysis. In pertinent part, Defendants announced the Phase 3 Orbit and Cosmic studies would now be "progressing toward final analysis."

163. Investors and analysts reacted immediately to Mereo's revelation that the interim data had not established a statistically significant link showing setrusumab reduced fracture rates in patients with OI. The price of Mereo's ADS declined dramatically. From a closing market price of $2.94 per ADS on July 9, 2025, Mereo's ADS price fell to $1.69 per ADS on July 10, 2025, a decline of about 42.52% in the span of just a single day.

164. Analysts directly linked the Company's press release and disclosure of setrusumab failing to demonstrate statistical significance in reducing fracture rates to the ADS price drop. JP Morgan issued an analyst report on July 9, 2025 stating: "This afternoon, Ultragenyx and Mereo announced the phase 3 ORBIT trial of setrusumab in osteogenesis imperfecta is progressing to the final analysis (expected around the end of the year). We wanted to pass on our quick thoughts. ***MREO shares are down ~35% on the news*** . . . ."

165. However, the July 9, 2025 press release was only a partial disclosure of the truth as many analysts and investors continued to believe Defendants' statements that setrusumab increased BMD and thus reduced fractures in OI patients. For instance, on July 9, 2025, BTIG analysts Julian Harrison and Reit Tan issued an analyst report stating that they still believed setrusumab would reach its Phase 3 primary endpoints and be proven to reduce fracture rates in OI patients. The BTIG analyst report parroted Defendants' false and misleading statements:

> Despite IA2 not meeting the prespecified threshold for disclosure, ***we still expect positive disclosure from the Phase 3 portion of Orbit upon final analysis*** based on the 6mo longer minimum follow-up (18mo vs. 12mo) and higher alpha spend for statistical significance (p<.04 vs. p<.01).

* * *

> BMD Z-score improvements from anti-sclerostin blockage ***should translate to clinical fracture benefit***. We believe the 14mo. data demonstrating significant reduction in fracture rate seen in the Phase 2 portion of ***Orbit significantly derisks the Phase 3 data*** readout. In addition to the expected translation of Phase 2 data, multiple studies have demonstrated associations of BMD Z-score and reduced fracture rate
>
> .

166. Similarly, Needham issued an analyst report on July 10, 2025 indicating Mereo's ADS price was down on the news of missing the second interim analysis, but that the analyst was confident that setrusumab increased BMD and that would translate to a decreased fracture rate.

> Mereo and Ultragenyx (RARE, NR) announced that the Phase III Orbit study will continue towards a final analysis expected in 4Q:25 after missing on its second interim. This outcome represents our downside scenario [ ], as such, we expect MREO to be under pressure today. However, our overall view on ***setrusumab's ultimate likelihood of success remains unchanged***, given ~80% alpha spend is reserved for the final analysis. ***Our confidence is supported by the established relationship between increases in BMD and reduction (over time) in fracture rates***. Thus, we maintain our Buy Rating

167. On December 29, 2025, Mereo issued a press release announcing that neither the ORBIT nor the COSMIC Phase 3 studies demonstrated a statistical significant reduction in fracture rates. The press release indicated that neither study met its primary endpoint of reduction in annualized clinical fracture rate compared to placebo or bisphosphonates, respectively, despite improved bone mineral density.

168. Investors and analysts reacted immediately to Mereo's revelation. The price of Mereo's ADS declined dramatically. From a closing market price of $2.31 per ADS on December 26, 2025, Mereo's ADS price fell to $0.29 per ADS on December 29, 2025, a decline of more than 87.7%.

169. JP Morgan issued a research report immediately after the press release connecting the failed Phase 3 trial data to the ADS price decline.

> This morning, Mereo, with partner Ultragenyx, announced ORBIT (placebo controlled) and COSMIC (bisphosphonate comparison) phase 3 trials of

> setrusumab in osteogenesis imperfecta (OI) did not meet the primary endpoint of reduction in annualized fracture rate (AFR). We wanted to pass on our quick thoughts after meeting with management. This has certainly been a disappointing turn of events given the prior data and setup into the trials. MREO shares are expected to trade at cash (~$0.5 / a share), however could trade lower due to negative-based sentiment.

170. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiffs and the other Class members have suffered significant losses and damages.

## VII. PLAINTIFFS' CLASS ACTION ALLEGATIONS

171. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Mereo publicly traded ADSs on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the Company's officers, directors and affiliates, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants or any other excluded person has or had a controlling interest.

172. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's ADSs were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

173. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

174. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

175. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company's ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

176. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the

wrongs done to them. There will be no difficulty in the management of this action as a class action.

177. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's ADSs met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;
- as a public issuer, the Company filed public reports;
- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- the Company's ADSs were liquid and traded with moderate to heavy volume during the Class Period; and
- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

178. Based on the foregoing, the market for the Company ADSs promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the ADSs, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

179. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## VIII. CAUSES OF ACTION

### COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

180. Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

181. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

182. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

183. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's ADSs during the Class Period.

184. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the

investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

185. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiffs and the Class.

186. As a result of the foregoing, the market price of the Company's ADSs was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's ADSs during the Class Period in purchasing the Company's ADSs at prices that were artificially inflated as a result of Defendants' false and misleading statements.

187. Had Plaintiffs and the other members of the Class been aware that the market price of the Company's ADSs had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's ADSs at the artificially inflated prices that they did, or at all.

188. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

189. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's ADSs during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

190. Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

191. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices

192. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

193. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to

engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company ADSs.

194. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) declaring this action to be a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## X. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 13, 2026

**THE ROSEN LAW FIRM, P.A.**

/s/ *Matthew P. Siben*
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

Matthew P. Siben
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: msiben@rosenlegal.com

*Counsel for Lead Plaintiff and Additional Plaintiffs and Lead Counsel for the Class*

**SCHALL BROWN & SCHWARTZ LLP**
Brian Schall, Esq.
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Phone: (310) 301-3335
Fax: (877) 590-0483
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff and Class*